En el Tribunal Supremo de Puerto Rico

| MISION INDUSTRIAL DE PUERTO RICO INC. Y OTROS Demandante-Apelante V. JUNTA DE CALIDAD AMBIENTAL DE PUERTO RICO Y OTROS Demandado-Apelado | APELACION 98TSPR85 |
|---|---|

Número del Caso: AA-96-40 Y AA-96-41

Abogados Parte Demandante: LCDO. PEDRO J. SAADE LLORENS

Abogados Parte Demandada: LCDO. FERNANDO MOLINI VIZCARRONDO

Abogados Sur Contra la Contaminación (SURCO, INC.): LCDO. DIEGO LEDEE BAZAN, LCDO. ERASMO RODRIGUEZ VAZQUEZ Y LCDO. PEDRO VALERA FERNANDEZ

Abogados Junta de Planificación: LCDO. HECTOR RAMOS ORTIZ
Tribunal de Instancia:

Abogados Autoridad de Energía Eléctrica: LCDO. JUAN VILLAFAÑE LOPEZ LCDA. MARIA M. MENDEZ.

Abogados del Amicus Curiae Departamento de Recursos Naturales.: HON. CARLOS LUGO FIOL, PROCURADOR GENERAL, LCDA. ROSA CORRADA, abogada del Departamento de Justicia.

Abogados de AES Puerto Rico, L.P.: LCDO. JUAN CARLOS GOMEZ ESCARCE, LCDO. RAFAEL R. VIZCARRONDO, LCDO. JAY GARCIA GREGORI, LCDO. SALVADOR ANTONETTI, LCDO. EDUARDO NEGRON NAVAS, LCDA. MARIA LUISA GONZALEZ, LCDO. PEDRO REYES BIBOLINI

Agencia: Junta de Calidad Ambiental R-96-9-1

Caso: DIA-JCA-95-0005(JP)

Fecha: 6/29/1998

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

MISION INDUSTRIAL DE P.R.
INC. Y OTROS

    Apelantes

      v.                   AA-96-40
                               AA-96-41

JUNTA DE CALIDAD AMBIENTAL
DE P.R. Y OTROS

    Apelados

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI

San Juan, Puerto Rico, a 29 de junio de 1998.

Nos toca resolver si la Junta de Calidad Ambiental actuó debidamente al aprobar la declaración de impacto ambiental preparada por la Junta de Planificación de Puerto Rico en el caso de autos, conforme lo dispuesto en la Ley Núm. 9 de 18 de junio de 1970, 12 L.P.R.A. sec. 1121 et seq., también conocida como la Ley de Política Pública Ambiental de Puerto Rico.

I

El 13 de octubre de 1994 la compañía Allied Energy Systems Puerto Rico, L.P., en adelante, AES, presentó ante la Junta de Planificación una consulta de ubicación para construir y operar una planta de cogeneración de energía en una finca localizada en el

Barrio Jobos del Municipio de Guayama, Puerto Rico. La planta propuesta tendría un costo de construcción de unos $650 millones de dólares, generaría enormes cantidades de vapor para clientes industriales en el área circundante, y tendría capacidad para producir 413 megavatios de energía eléctrica. Dicha planta utilizaría carbón de piedra como combustible.

A esos efectos, AES presentó ante la Junta de Planificación una declaración de impacto preliminar, la cual, posteriormente, esta agencia, en calidad de agencia proponente, presentó para su aprobación ante la Junta de Calidad Ambiental de Puerto Rico. Esta gestión era necesaria, debido a que el desarrollo del proyecto aludido podría afectar significativamente la calidad del medio ambiente, por lo que, conforme la Ley de Política Ambiental, supra, Artículo 4-C, se requiere la preparación de la correspondiente declaración de impacto ambiental.[1]

Así las cosas, y como parte del proceso evaluativo de la declaración de impacto ambiental preliminar antes mencionada, la Junta de Calidad Ambiental celebró vistas públicas en Guayama el 15 y 22 de julio de 1995, a las que comparecieron varios grupos de personas, tanto en nombre propio como de sus empresas, instituciones y organizaciones, así como varios grupos de acción ciudadana. Luego de terminadas las vistas públicas, la Junta de Calidad Ambiental concedió quince días a todos los interesados para que sometiesen sus comentarios sobre

la declaración de impacto ambiental preliminar aludida. El 4 de diciembre de 1995, el panel examinador que presidió las vistas, que estaba integrado por tres personas, presentó un informe ante la consideración de la Junta de Gobierno de la Junta de Calidad Ambiental. En este informe se hicieron ciertos señalamientos respecto al contenido de la declaración de impacto ambiental preliminar, que se examinarán posteriormente en esta opinión.

---

[1] La práctica de someter una declaración de impacto ambiental preliminar es requerida por el Reglamento sobre Declaraciones de Impacto Ambiental, promulgado por la Junta de Calidad Ambiental el 1 de junio de 1984. Este exige que sea sometida una declaración de impacto ambiental preliminar, antes de someter una declaración de impacto ambiental per se.

El 4 de marzo de 1996, la Junta de Calidad Ambiental emitió una extensa resolución, mediante la cual determinó que la Junta de Planificación había cumplido cabalmente con los requisitos de la Ley de Política Pública Ambiental, supra. Resolvió, que la declaración de impacto ambiental preliminar en cuestión era adecuada. Resolvió además, que todos los comentarios vertidos por el panel examinador en su informe, que se referían a cuestiones levantadas por los opositores al proyecto, ya habían sido previamente atendidos en la declaración de impacto ambiental preliminar que se presentó originalmente. Instruyó a la Junta de Planificación a incorporar a la declaración de impacto ambiental preliminar los comentarios emitidos por personas particulares, agencias de Gobierno y otras entidades, sobre los aspectos ambientales del proyecto, así como la copia de la resolución de la Junta de Calidad Ambiental, a fin de quedar constituida, de este modo, la declaración de impacto ambiental final.

El 25 de marzo de 1996, la Junta de Planificación sometió ante la Junta de Calidad Ambiental la declaración de impacto ambiental final, a la que en adelante, nos referiremos como la "declaración de impacto ambiental". En la misma fecha, Misión Industrial de P.R., Inc., en adelante, Misión Industrial, y Sur Contra la Contaminación, Inc., en adelante, SURCO, presentaron sendas mociones de reconsideración respecto a la resolución de la Junta de Calidad Ambiental de 4 de marzo de 1996, a las cuales AES se opuso. El 8 de abril de 1996, la Junta de Calidad Ambiental emitió otra resolución, mediante la cual evaluó los planteamientos formulados en las solicitudes de reconsideración referidas, y reafirmó su previa aprobación de la declaración de impacto ambiental.[2]

Inconformes con esta decisión, Misión Industrial y SURCO presentaron ante este Tribunal sendos recursos de apelación[3], al amparo de las normas

---

[2] "Guayameses Pro Salud y Buen Ambiente" y el ingeniero Juan G. Muriel presentaron también mociones de reconsideración. Fueron denegadas en los méritos y por falta de jurisdicción, respectivamente.

[3] Los recursos de apelación fueron presentados ante este Tribunal por Misión Industrial y SURCO el 8 y el 9 de mayo de 1996, respectivamente.

vigentes en ese momento, la sección 3.002(e) de la Ley de la Judicatura de 1994 y la Regla 5(a) de las Reglas de Transición del Reglamento del Tribunal Supremo[4]. El 31 de mayo de 1996, consolidamos los recursos aludidos. El 30 de julio de 1996 compareció ante nos el Departamento de Recursos Naturales[5].

En los recursos de apelación referidos, los peticionarios señalan la comisión de numerosos errores. Los señalados en el recurso de Misión Industrial son los siguientes:

A. Erró la Junta apelada al determinar que la declaración de impacto ambiental preliminar acataba el artículo 4(C) de la Ley sobre Política Pública Ambiental.

B. [...][6]

C. Erró la J.C.A. al no rechazar la DIA-P a pesar de la ausencia de la consideración de alternativas a la planta de la AES.

---

[4] El Plan de Reorganización Núm. 1 de la Rama Judicial de 28 de julio de 1994, también conocido como la Ley de la Judicatura de de Puerto Rico de 1994, fue enmendado por la Ley Núm. 248 de 25 de diciembre de 1995. Dicha enmienda no es aplicable al caso de autos, pues la decisión de la agencia recurrida es anterior a la vigencia de la nueva ley. Es por ello que los recursos ante nos son apelaciones.

[5] Ha sido aceptada la comparecencia como Amicus Curiae del Departamento de Recursos Naturales, mas no las del Colegio de Ingenieros y de la Cámara de Comercio. La Junta de Planificación, AES y la Autoridad de Energía Eléctrica comparecen como partes interventoras.

[6] En el señalamiento de error B de Misión Industrial, se plantea que la Junta de Calidad Ambiental debió rechazar la declaración de impacto ambiental porque fue preparada y financiada por AES, una empresa privada, y no por la Junta de Planificación. Este error no fue levantado ante la consideración de la Junta de Calidad Ambiental, y de ordinario este Foro no considera en revisión cuestiones que no hayan sido planteadas o resueltas por la agencia administrativa apelada, Garaje Rubén, Inc. v. Tribunal Superior, 101 D.P.R. 236 (1973). Sin embargo, por la obvia importancia del planteamiento, debemos atenderlo. Basta señalar respecto a este asunto que la reglamentación de la Junta de Calidad Ambiental permite la intervención de partes privadas en la preparación de la declaración de impacto ambiental; y que ello es razonable. No es impropio que una agencia pública, con recursos limitados, reciba ayuda de partes privadas en la compleja y a veces muy costosa labor de obtener o desarrollar la información técnica o científica que es necesaria para la preparación de una declaración de impacto ambiental. Lo que es imprescindible es que la agencia haya mantenido una postura independiente y objetiva al formular la declaración. Véase al respecto, Essex Cty. Preservation Ass´n v. Campbell, 536 F.2d 956 (1976); Sierra Club v. Lynn, 502 F.2d 43 (1974); Life of the Land v. Brinegar, 485 F2d 460 (1973).

D. Erró la J.C.A. al haber concluido que la DIA-P habría considerado y evaluado conforme a Derecho los impactos por extracción de piedra caliza.

E. Erró la J.C.A. al no considerar o incorporar importante información sobre la salud, previo a su aprobación de la DIA-P.

F. Erró la J.C.A. al concluir que la DIA-P había considerado, otros impactos ambientales.

G. Erró la J.C.A. al autorizar la DIA-P sin que se conozcan las consecuencias ambientales de la disposición de cenizas.

Los errores señalados en el recurso de SURCO son los siguientes:[7]

1. La planta de carbón en la zona propuesta y la DIA-P no cumplen con los objetos de la Ley de Política Pública Ambiental.

2. El aval que la J.C.A. le ha dado a la DIA-P está viciado de error porque restringe su función a comentar <u>sólo</u> si el análisis del impacto ambiental que se esboza en la DIA-P es adecuado o no.

3. Las fuentes de extracción de 6 millones de galones de agua que necesitará la planta no queda aclarada en la DIA-P ni en la Resolución de la J.C.A.

4. [...]

5. El contenido de la DIA-P falla en discutir los efectos sinergísticos que pueden ocurrir al añadirse las emisiones de la AES a los contaminantes diversos ya existentes.

---

[7] Hay varios errores señalados por SURCO que no ameritan ser examinados en detalle. Veamos.

En el número 4 de su alegato, se planteó que erró la Junta de Calidad Ambiental al aprobar la declaración de impacto ambiental, partiendo de la premisa de que se iba a firmar un contrato para vender el vapor a cierta industria vecina, sin someter evidencia de ello. Este señalamiento es prematuro. En esa etapa de los procedimientos, la agencia apelada no tenía potestad, ni para especular sobre la posible venta de vapor ni para exigir contrato alguno, pues estaba evaluando una declaración de impacto ambiental, no estaba otorgando un permiso.

En el error 7 del alegato, se hicieron unos planteamientos que resultan ser académicos. Tratan sobre la falta de traducción de ciertos apéndices, los cuales fueron traducidos posteriormente y aparecen así en los apéndices de la DIA.

En el error 12, se adujo que no se permitió el contrainterrogatorio de los deponentes en las vistas por parte de los opositores al proyecto. No obstante, no se ha anejado la transcripción de la vista pública. No se nos pone en posición de evaluar si el error fue, en efecto, cometido, máxime cuando la otra parte y la agencia apelada sostienen que la falta alegada no fue objetada oportunamente en el proceso administrativo.

6. La Resolución de la J.C.A. no está sostenida en la prueba aportada durante las vistas ofrecidas.

7. [...]

8. No cumple la DIA-P con la política pública ambiental al no disponer de un plan específico para disponer de las miles de toneladas de cenizas diarias que genera la planta de carbón.

9. A pesar de habérsele informado a la J.C.A. de sendos informes en posesión del Departamento de Educación (el primero, El Problema Ambiental de la Escuela Ramona Mendoza Santos de Guayama, de junio de 1995, preparado por la entidad Servicios Científicos y Técnicos; el segundo Planta de Energía para Guayama, Problemas Ambientales Escuelas y Barrio Jobos, de septiembre de 1995, por encomienda del Presidente del Senado de Puerto Rico), que ameritan reabrir la discusión de la DIA-P, la agencia soslayó el planteamiento y ningún pronunciamiento hizo sobre el particular. La J.C.A. ha hecho caso omiso a la información ofrecida por los interventores, obtenida de la propia AEE y sometida por esta agencia a sus bonistas y acreedores el 15 de agosto de 1995, en la que se corrobora que las cogeneradoras no son necesarias y que los puertorriqueños sufriremos un aumento en nuestras facturas de aproximadamente un 25%.

10. Según la información aparcelada que ha ofrecido la propia AEE, en la que se afirma que serán necesarios unos 1,000 ó 1,200 megavatios de capacidad generatriz adicional entre los años 2000 a 2003, la totalidad de proyectos que se discuten y las mejoras de la AEE llegarán a triplicar la cantidad de megavatios necesarios.

11. La DIA-P no cumple con el requisito de la Política Pública Energética, Orden Ejecutiva del Gobernador de Puerto Rico del 28 de diciembre de 1993, que requiere un estudio de costo-beneficio. Sólo ofrece datos parciales de algunos beneficios y costos sociales, lo que no constituye un estudio de costo-beneficio y menos una conclusión del beneficio o costo neto del proyecto desde una óptica social.

12. [...]

El 23 de julio de 1996 se presentó el alegato de Misión Industrial; el 24 de julio el de SURCO; el 1 de agosto el de la Junta de Planificación; y el 7 de agosto el de la Junta de Calidad Ambiental y el de AES. El 20 de agosto de 1996 se presentó la intervención como amicus curiae del Departamento de Recursos Naturales.

Antes de entrar de lleno al examen de los errores referidos, es menester aludir a la normativa aplicable a la controversia ante nos.

II

A. El Marco Constitucional

Como se sabe, en Puerto Rico la normativa jurídica sobre los recursos naturales y el medio ambiente tiene una insoslayable dimensión de orden constitucional. Los miembros de la Convención Constituyente del Estado Libre Asociado entendían que el uso y conservación de nuestros recursos naturales era un asunto tan importante para el bienestar general del país, que decidieron que éste debía elevarse a rango constitucional. Paoli Méndez v. Rodríguez, 138 D.P.R. __, op. de 5 de mayo de 1995, 95 JTS 57.

El Artículo VI, Sección 19, de nuestra Constitución dispone que:

> Será política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad.

Esta disposición no es meramente la expresión de un insigne afán, ni constituye tampoco sólo la declaración de un principio general de carácter exhortativo. Se trata, mas bien, de un mandato que debe observarse rigurosamente, y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste. Como bien señala Trías Monge, el informe de la Comisión que redactó la disposición constitucional aludida, fue claro y perentorio. Se pretendió con dicha disposición establecer un deber ineludible del Estado. III J. Trías Monge, Historia Constitucional de Puerto Rico, 235 (1982). En el referido informe se señaló lo siguiente:

> Es nuestro propósito señalar con absoluta claridad la conveniencia y necesidad de que se conserven los recursos naturales en Puerto Rico. Siendo Puerto Rico una isla y teniendo pocos recursos naturales, debe haber una preocupación constante por parte del Estado en el uso, desarrollo, aprovechamiento y conservación de los mismos. La conservación de la tierra, los bosques, los peces, las aguas, las aves, las minas y las salinas, entre otros, debe ser una de las funciones primordiales de nuestro Gobierno. (Enfasis suplido.) 4 Diario de Sesiones 2622.

Conforme a este claro historial constitucional, en Puerto Rico, cualquier decisión o determinación del Estado que incida sobre los recursos naturales debe responder cabalmente al doble mandato de la Sección 19 de lograr la más eficaz conservación de los recursos naturales, a la vez que se procura el mayor desarrollo y aprovechamiento de esos recursos para el beneficio general de la comunidad. Dicha Sección fija de

modo incuestionable el criterio jurídico primordial para juzgar la validez o interpretar el significado de cualquier norma *o decisión* relativa al uso o protección de los recursos naturales formulada por la Asamblea Legislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental.

B.  La Ley sobre Política Pública Ambiental

En 1970, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 9 sobre Política Pública Ambiental, supra, en adelante la Ley 9.  Esta pieza legislativa constituye el primer y principal esquema estatutario adoptado en Puerto Rico para atender de modo integral los asuntos concretos que se plantean en el país en relación a la administración del medio ambiente. Véase, A.O. Jiménez, Comentario sobre legislación, 41 Rev. Jur. U.P.R. 115 (1972).  Dicha Ley 9 se tomó en su mayor parte, casi literalmente, de la National Environmental Policy Act de 1969, 42 USCA 4321 et seq.  Id. Véase además, N. Martí, Article 4 C of The Environmental Public Policy Law: A need for clarification, 36 Rev. Col. Abogados 771 (1975).  Véase también, Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 720 (1974). En  vista de ello, debemos referirnos a tal legislación federal, y a la jurisprudencia que ésta ha generado, como fuentes importantes para la interpretación de nuestra propia ley.  Bruno López v. Motorplan, Inc. y otro, op. de 16 de julio de 1993, 134 D.P.R. ___, 93 JTS 123;  Pérez Maldonado v. J.R.T., op. de 12 de marzo de 1993; 134 D.P.R. ___, 93 JTS 38.  El uso de estas fuentes federales, claro está, será en armonía con las exigencias de la política ambiental que fija nuestra Constitución, con el historial y sentido de nuestra propia Ley 9, y con las realidades particulares de Puerto Rico, para así imprimirle a nuestra Ley 9 su significado más atinado.  Salas Soler v. Srio. de Agricultura, supra, págs. 721-722.  Véase además, Clavell v. El Vocero de Puerto Rico, 115 D.P.R. 685, 690 (1984);  Textile Dye Workers, Inc. v. Srio. de Hacienda, 95 D.P.R. 708, 712-713 (1968);  Pereira v. IBEC, 95 D.P.R. 28, 83 (1967).

La Ley 9, aunque deriva sustancialmente de la ley federal sobre el mismo tema, refleja en buena medida la política pública sobre los recursos naturales que ordena nuestra Constitución. En lo más pertinente de su declaración de principios se establece que:

> El Estado Libre Asociado, en pleno reconocimiento del profundo impacto de la actividad del hombre en las interrelaciones de todos los componentes del medio ambiente natural, [. . .] y reconociendo además la importancia crítica de restaurar y mantener la calidad medio ambiental al total bienestar y desarrollo del hombre, declara que es política continua del Gobierno del Estado Libre Asociado, incluyendo sus municipios, [. . .] utilizar todos los medios y medidas prácticas, [. . .] para crear y mantener las condiciones bajo las cuales el hombre y la naturaleza puedan existir en armonía productiva y cumplir con las necesidades sociales y económicas y cualesquiera otras que puedan surgir con las presentes y futuras generaciones de puertorriqueños.

> Para llevar a cabo la política que se enmarca en este Capítulo, es responsabilidad continua del Estado Libre Asociado utilizar todos los medios prácticos. [. . .] con el fin de que Puerto Rico pueda:

> (1) Cumplir con las responsabilidades de cada generación como custodio del medio ambiente para beneficio de las generaciones subsiguientes; [. . .]

> (3) lograr el más amplio disfrute de los usos beneficiosos del medio ambiente sin degradación, riesgo a la salud de o seguridad u otras consecuencias indeseables; [. . . .]

> (6) mejorar la calidad de los recursos renovables y velar por el uso juicioso de aquellos recursos que sufran agotamiento.

> El Estado Libre Asociado reconoce que toda persona deberá gozar de un medio ambiente saludable. [. . .]

La Ley 9 también ordena en el primer párrafo de su Artículo 4, 12 L.P.R.A. sec. 1124, que todos los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado de Puerto Rico están obligados a interpretar, implementar y administrar todas las leyes y cuerpos reglamentarios del país "en estricta conformidad con la política pública" enunciada en dicha Ley 9 "al máximo grado posible". Esta rigurosa obligación, fijada en términos claros, es consistente con el mandato constitucional identificado antes. Se trata de una disposición estatutaria que hace manifiesta la imperiosa intención legislativa de proteger el medio ambiente cumplidamente. En efecto, en el Informe

Conjunto del 17 de abril de 1990 de las Comisiones Senatoriales de lo Jurídico Civil y de Salud y Bienestar en torno al proyecto que dio lugar a la Ley 9 se resaltó la importancia de:

> mantener un ambiente que permita a nuestro alrededor la mayor pureza y limpieza del aire, del agua [. . .] Vuestras Comisiones entienden que la aprobación de esta medida es de la mayor importancia y urgencia. Es imprescindible que el Estado Libre Asociado defina con toda claridad y precisión necesarias su política pública sobre conservación del ambiente y de los recursos naturales. Al así hacerlo, Puerto Rico unirá su esfuerzo a la labor de la gran mayoría de los países progresistas del mundo, que hoy día dan al tema de la conservación ambiental la más alta prioridad, en evitación de los graves males que la contaminación y el uso irrestricto de los recursos naturales amenazan con acarrear a la humanidad.

Las disposiciones aludidas de la Ley 9, pues, constituyen un mandato legislativo deliberado, que está en sustancial armonía con el de la Constitución.

C. La Declaración de Impacto Ambiental

El Artículo 4 (c) de la Ley 9, 12 L.P.R.A. sec. 1124 (c), requiere que antes de efectuarse cualquier acción, o promulgarse cualquier decisión gubernamental que afecte significativamente la calidad del ambiente, el funcionario concernido debe someter una declaración de impacto ambiental a la instrumentalidad pública con jurisdicción sobre la propuesta.[8] García

---

[8] El inciso (c) del Artículo 4 referido dispone:

> (c) Incluir en toda recomendación o informe propuesta de legislación y emitir antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente, una declaración escrita y detallada sobre:
>
> (1) El impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse;
>
> (2) cual[es]quiera efectos adversos al medio ambiente que no podrán evitarse si se implementare la acción o promulgare la decisión gubernamental;
>
> (3) alternativas a la legislación propuesta, o a la acción o decisión gubernamental en cuestión;
>
> (4) la relación entre usos locales a corto plazo del medio ambiente del hombre y la conservación y mejoramiento de la productividad a largo plazo, y

<u>Oyola v. J.C.A.</u>, op. de 21 de febrero de 1997, 142 D.P.R. __, 97 JTS 25. <u>Salas Soler v. Srio. de Agricultura</u>, <u>supra</u>. En dicha declaración, la agencia gubernamental proponente tiene la obligación de considerar y detallar por escrito todas las consecuencias ambientales significativas vinculadas a la acción propuesta. El propósito de este primer requisito de la declaración de impacto ambiental es <u>dual</u>. Por un lado, se procura con ello que la propia agencia proponente considere a fondo las consecuencias ambientales significativas de la acción o proyecto que contempla. Véase, <u>Robertson v. Methow Valley</u> 490 US 332 (1988); <u>Weinberger v. Catholic Action of Hawaii</u>, 454 US 139 (1981). Como lo ha explicado el Tribunal Supremo federal, se busca que la agencia tome "a 'hard look' at environmental consequences". <u>Kleppe v. Sierra Club</u>, 427 US 390, 410 (1976).[9]

Según dicho foro, para que ello ocurra "an agency must allow all significant environmental risks to be factored into the decision whether to undertake a proposed action." <u>Baltimore Gas & Electric Co. v. NRDC</u>, 462 US 87, 100 (1983). Por otro lado, con la declaración de impacto ambiental también se persigue que se informe a las partes concernidas, al propio Gobierno y al público en general de las consecuencias ambientales aludidas, para que todos ellos puedan tomar la acción que estimen procedente sobre el proyecto propuesto. El más alto foro judicial federal ha descrito estos dos propósitos en la siguiente manera, en <u>Robertson v. Methow Valley Citizens Council</u>, <u>supra</u>, a la pág. 349:

> The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects. [. . .] It ensures that the agency, in

---

(5) <u>cualquier compromiso irrevocable o irreparable</u> de los recursos que estarían envueltos en la legislación propuesta <u>si la misma se implementara</u>, en la acción gubernamental si se efectuara o en la decisión si se promulgara. (Enfasis suplido.)

[9] En <u>Kleppe v. Sierra Club</u>, <u>supra</u>, el Supremo federal dijo lo siguiente:

"The only role of a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken."

reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

Las consecuencias ambientales a detallarse son aquellas que sean "significativas". **Ello quiere decir que la agencia proponente debe realizar un esfuerzo serio y escrupuloso por identificar y discutir todas las consecuencias ambientales de importancia que sean previsibles**. No es menester examinar impactos remotos, triviales o especulativos, sino aquellos que el especialista en la materia concienzudamente estima que deben detallarse. Robertson v. Methow Valley Citizens Council, supra. Vease además, Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d 585 (1981); Trout Unlimited v. Morton, 509 F.2d 1276 (1974).

Otro ingrediente de las declaraciones de impacto ambiental es la discusión de los pasos que pudiesen ser tomados para mitigar las consecuencias ambientales adversas que generaría, de ser implementada, la acción propuesta.[10] La Ley 9, requiere, además, que la declaración de impacto ambiental contenga una discusión de las alternativas a la acción propuesta. 12 L.P.R.A. sec. 1124(c)(3). Aquí, de nuevo, no se pretende que la agencia proponente examine todo tipo de proyecto alterno que pueda concebirse. Lo esencial es que quede demostrado que el curso de acción propuesto es, en balance, el de menor impacto ambiental, a la luz de todos los factores legítimos que son pertinentes. Véase, Vermont Yankee Nuclear Power Corp. V. N.R.D.C., 435 US 519 (1977). Véase además, Robertson v. Methow Valley, supra, a la pág. 350.[11]

---

[10] Se trata de un requisito reglamentario, establecido por la propia Junta de Calidad Ambiental en virtud de los amplios poderes que le otorgará para ello el Artículo 4 de la Ley 9, que es idóneo con el propósito de la declaración de impacto ambiental. Véase las secciones 5.3.6(g); 5.3.7(e) y 5.4.1 del Reglamento sobre Declaraciones de Impacto Ambiental.

[11] El Supremo federal indicó lo siguiente:

"...it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the

Debe enfatizarse que el proceso de preparar y aprobar una declaración de impacto ambiental es, en esencia, sólo un instrumento para asegurar que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y tomar las primeras decisiones gubernamentales sobre una propuesta que pueda tener un impacto en el medio ambiente. En situaciones como la de autos, dicha declaración es sólo un instrumento de planificación, la primera etapa de un largo camino de autorizaciones oficiales en el desarrollo de un proyecto. Robertson v. Methow Valley, supra, a las págs. 349-350; Baltimore Gas & Electric Co. v NRDC, supra, a las págs. 87-88; y Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 US 223, 227-28 (1980). La aprobación de la declaración de impacto ambiental de ningún modo significa que más adelante no han de tomarse otras medidas afines, para proteger el ambiente. No representa una carta blanca sobre lo ambiental respecto a la acción o decisión gubernamental que ocasionó la declaración referida. Por el contrario, superada la etapa de la aprobación de la declaración de impacto ambiental, la construcción y el inicio de operaciones del proyecto propuesto no pueden llevarse a cabo sin que se aprueben toda una serie de permisos que también están dirigidos a asegurar la protección ambiental. Es precisamente en la etapa de obtener los particulares permisos de construcción y de operaciones aludidos que se fijan concretamente los controles de contaminación necesarios. En esa etapa la Junta de Calidad Ambiental, otras agencias concernidas, las partes interesadas y los propios tribunales tienen de modo muy particular el deber y la responsabilidad de velar porque se cumpla rigurosamente con la política pública ambiental del país. Además, aun después de haber comenzado las operaciones, si el proyecto contemplado por la agencia proponente no se desarrolló o se llevó a cabo según descrito en la declaración de impacto ambiental, o si las consecuencias ambientales previstas en dicha declaración han resultado ser más graves que lo anticipado, o si surgen

---

agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."

impactos adversos no previstos, la Junta de Calidad Ambiental tiene la facultad y el deber de tomar todas las medidas adecuadas para evitar cualquier daño al ambiente o a los recursos naturales que pueda por ello ocurrir, y el hecho de que la Junta haya aprobado antes una declaración de impacto ambiental en modo alguno impide que tome tales medidas. 12 L.P.R.A. secc. 1131(14), (22), (29) y (30). Del mismo modo, bajo el Artículo 20 de la Ley 9, 12 L.P.R.A. 1139, cualquier persona con debido interés puede presentar una acción civil por los daños que le haya ocasionado la violación a la política pública ambiental del país, o puede solicitar un mandamus para que se cumpla con dicha política pública, y la previa aprobación de una declaración de impacto ambiental no constituye necesariamente una defensa contra dichas acciones. Existen, pues, remedios y recursos tanto para evitar como para atender daños al medio ambiente no previstos en una declaración de impacto ambiental o que resulten de una declaración que no fue preparada o aprobada de buena fe. La Junta de Calidad Ambiental tiene una clara encomienda legislativa de asegurar que se eviten y que se conjuren los daños ambientales, que va más allá de sus responsabilidades particulares respecto a la aprobación de las declaraciones de impacto ambiental. Del mismo modo, cualquier ciudadano o grupo de ciudadanos afectados por la falta de implementación de la Ley 9 puede presentar las acciones judiciales que procedan para asegurarse que se logren los fines de protección ambiental referidos, independientemente de que se hubiese aprobado ya una declaración de impacto ambiental respecto al proyecto en cuestión. Salas Soler v. Srio. de Agricultura, supra. Sobre todo en vista de la dimensión constitucional que tiene la protección ambiental en nuestra jurisdicción, los tribunales de Puerto Rico deben velar celosamente porque se cumplan las expectativas de conservación y uso racional de los recursos naturales contenidos en las declaraciones de impacto ambiental aprobadas por la Junta. Véase, Columbia Basin Land Protection Assn. v. Schlesinger, supra, a la pág. 591-592; y Van Abbema v. Fornell, 807 F. 2d 636-7 (1986). Véase, además, T. O. Mc'Garity, Judicial Enforcement of NEPA-Inspired Promises, 20 Envtl. L.

569 (1990); Note, <u>EIS Supplements for Improperly Completed Projects: A Logical Extension of Judicial Review under NEPA</u>, 81 Mich. L. Rev. 221 (1952); Comment, <u>Enforcing the "commitments" Made in Impact Statements: A Proposed Passage through a Thicket of Case Law</u>, 10 Envtl. L. Rev. 10153 (1980).

D.   <u>La Función de la Junta de Calidad Ambiental</u>

El referido Artículo 4 de la Ley 9 fija la autoridad de la Junta de Calidad Ambiental para examinar y aprobar las declaraciones de impacto ambiental formuladas por las agencias gubernamentales proponentes. <u>García Oyola v. Jta. Calidad Ambiental</u>, <u>supra</u>. Dicha Junta también está autorizada a aprobar los reglamentos que sean necesarios para implementar las disposiciones de ley sobre dichas declaraciones de impacto ambiental.[12]

Esta función de la Junta es de vital importancia para la consecución adecuada de la política pública ambiental del país. Significa que la labor de fiscalización no sólo queda en manos de una entidad <u>distinta</u> a la que propone el proyecto en cuestión, sino además que queda en manos de una entidad <u>especializada en asuntos ambientales</u>, cuya función principal es precisamente velar por el fiel cumplimiento de la política pública ambiental de Puerto Rico. Se asegura así la objetividad y el profesionalismo que es necesario para que se lleve a cabo el mandato constitucional y estatutario de usar y conservar los recursos naturales adecuadamente. Se asegura además, que cada declaración de impacto ambiental sea objeto de un doble examen, lo cual es una garantía adicional para al cumplimiento con el mandato constitucional.

Para realizar su labor, la Junta debe examinar cuidadosamente la declaración sometida por la agencia proponente y verificar que se hayan cumplido cabalmente los requisitos procesales y substantivos fijados por

---

[12] La Junta de Calidad Ambiental promulgó una reglamentación para implementar el artículo 4(c) de la Ley 9, <u>supra</u>. Aprobó un <u>Manual para la Preparación, la Evaluación y el Uso de las Declaraciones de Impacto Ambiental</u> el 19 de diciembre de 1972, el cual fue incorporado al <u>Reglamento sobre Declaraciones de Impacto Ambiental</u>, el 1 de junio de 1984.

la Ley 9 y por los reglamentos aprobados a su amparo.  <u>García Oyola v.</u> <u>Junta de Calidad Ambiental</u>, <u>supra</u>.  Recae sobre la Junta primordialmente la responsabilidad de verificar que la acción contemplada por la agencia proponente representa, en balance, la alternativa con el menor impacto ambiental, a la luz de todos los factores legítimos que son pertinentes. Su función ineludible es la de comprobar que se haya observado rigurosamente el esquema jurídico sobre lo ambiental, que fue resumido de manera clara por el Juez Skelly Wright en su conocida opinión en <u>Calvert</u> <u>Cliffs' Coor. Com. v. United States A. E. Com´n.</u>, 449 F.2d 1109, 1115 (1971):

> [. . .]  In general, all agencies must use a "systematic, interdisciplinary approach" to environmental planning and evaluation "in decision making which may have an impact on man's environment".  In order to include all possible environmental factors in the decisional equation, agencies must "identify and develop methods and procedures [. . .] which will insure that presently unquantifiable environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations".  To "consider" the former "along with" the latter must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not.  But NEPA mandates a rather finely tuned and "systematic" balancing analysis in each instance".

D. <u>Revisión Judicial</u>

La propia Ley sobre Política Pública Ambiental expresamente dispone el alcance de nuestra intervención en casos como el de autos, al ordenar que la revisión judicial se ha de llevar a cabo a base del expediente administrativo de los procedimientos ante la Junta de Calidad Ambiental y que las determinaciones de hechos de ésta serán concluyentes si están sostenidas por evidencia sustancial.  12 L.P.R.A. sec. 1134(g).  Se trata, pues, del mismo alcance que tiene la revisión judicial respecto a las decisiones de cualquier otro organismo administrativo.  Véase 3 L.P.R.A. sec. 2175;  <u>Facultad Ciencias Sociales v. Consejo de Educación Superior</u>, opinión del Tribunal del 2 de junio de 1993, 134 D.P.R. ___, 93 JTS 88. Según hemos resuelto reiteradamente, las determinaciones de organismos administrativos especializados, como es la Junta de Calidad Ambiental, merecen gran consideración y respeto.  <u>San Vicente v. Policía de P.R.</u>, op.

de 12 de noviembre de 1996, 142 D.P.R. ____ (1996), 96 J.T.S. 148; Metropolitana, S.E. v. A.R.P.E., op. de 10 de abril de 1995, 138 D.P.R. ____ (1995), 95 J.T.S. 39; Fuertes y otros v. A.R.P.E., op. de 17 de diciembre de 1993, 134 D.P.R. ____ (1993), 93 J.T.S. 165; y Asoc. Drs. Med. Cui. Salud V v. Morales, op. de 1ro de febrero de 1993, 134 D.P.R. ____ (1993), 93 J.T.S. 12. Por ello, estamos obligados a sostener tales determinaciones si son conforme a derecho, y si las conclusiones en cuanto a los hechos están respaldadas por evidencia suficiente que surja del expediente administrativo considerado en su totalidad. Facultad Ciencias Sociales v. Consejo de Educación Superior, supra.

A la luz de esta conocida normativa, nuestra función en casos como el de autos es la de verificar si la Junta de Calidad Ambiental ha cumplido cabalmente con todas sus obligaciones legales y si formuló sus determinaciones fundamentadamente. En concreto, nos toca verificar que la Junta de Calidad Ambiental haya examinado adecuadamente todas las consecuencias ambientales significativas que sean razonablemente previsibles, y que haya discutido de igual modo todas las alternativas que razonablemente existan a la acción contemplada por la agencia proponente. De esta manera ejercemos nuestra responsabilidad de velar porque la Junta haya dado cumplimiento al esquema estatutario y reglamentario que le rige, y la de procurar que se observe la política ambiental del país que, como hemos señalado ya, es de origen constitucional.

Nuestro rol de constatar que la Junta de Calidad Ambiental haya cumplido con sus preeminentes deberes jurídicos, sin embargo, no significa que le corresponde al foro judicial pasar juicio sobre los méritos sustantivos de la acción propuesta. Es decir, no nos corresponde sustituir nuestro criterio por el de la agencia proponente, o el de la Junta de Calidad Ambiental. Como ha señalado el Tribunal Supremo federal en Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra, a las págs. 227-8 (1980):

> [. . .] the only role for a court is to insure that the agency has considered the environmental consequences; it cannot

"interject itself within the area of discretion of the executive as to the choice of the action to be taken".

Véase también, Vermont Yankee Nuclear Power Corp. v. NRDC, supra; Kleppe v. Sierra Club, supra. En particular, no nos corresponde entrar a dilucidar los conflictos que puedan existir entre opiniones científicas sobre alguna cuestión ambiental. County of Suffolk v. Sec. of Interior, 562 F.2d 1368, 1383 (1977); Life of the Land v. Brinegar, 485 F.2d 460, 472-3 (1973).

A modo de resumen, conviene citar lo expresado por el distinguido jurista Skelly Wright en Izaak Walton League of America v. Marsh, 655 F.2d 346, a las págs 371-372 (1981), que expresa suscitamente al alcance de la revisión judicial respecto a la declaración de impacto ambiental:

> "In reviewing compliance with NEPA, courts must first determine whether the agency has complied with its "procedural" obligations under Section 102, which establishes the environmental impact statement requirement: it must ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a "hard look" at environmental factors, and to make a reasoned decision. Second, reviewing courts must determine whether the agency has complied with its "substantive" obligations under Section 101; it must ensure that the agency's conclusions are not irrational or otherwise "arbitrary and capricious." In making these determinations the courts must be governed by a "rule of reason." They should not substitute their judgment for that of the agency. In particular, they should not attempt to resolve conflicting scientific opinions. So long as the agency's conclusions have a substantial basis in fact, the mandate of NEPA has been satisfied." (Citas omitidas).

### III

Con los criterios normativos antes mencionados en mente, procederemos ahora a atender los errores señalados por los peticionarios. Para fines de simplificar la discusión, hemos agrupado los errores en dos grupos: los relativos a la declaración de impacto ambiental en si, y los relativos a las cuestiones ambientales contenidas en la declaración de impacto ambiental. Comenzaremos por el primer grupo.

SURCO nos señaló como error, que al examinar la declaración de impacto ambiental del caso de autos, la Junta de Calidad Ambiental se limitó a decidir sólo si el análisis del impacto ambiental en la

declaración es adecuado o no, abdicando así su rol fiscalizador.[13] Sostiene que la agencia apelada es custodio de nuestro ambiente y que evadió dicha responsabilidad al no discutir "desde el punto de vista ambientalista" la declaración de impacto ambiental. No tiene razón.

Como expresamos anteriormente, es innegable que la Junta de Calidad Ambiental ejerce una ingente función fiscalizadora. Tiene la responsabilidad de velar por que la declaración de impacto ambiental presentada ante su consideración cumpla cabalmente con todos los requisitos legales y reglamentarios pertinentes. Su rol fiscalizador incluye también constatar que el análisis de las consecuencias ambientales formulado por la agencia proponente en la declaración de impacto ambiental sea riguroso y completo, y que ofrezca al público toda la información pertinente.

Todo ello ocurrió aquí. La Junta de Calidad Ambiental tuvo ante sí los estudios científicos presentados, tanto por los promoventes, como por los opositores al proyecto. Estos abarcaban materias sumamente especializadas. En su resolución, la Junta de Calidad Ambiental hizo constar que había evaluado todos los escritos, que revisó la documentación técnica y que tomó en consideración las recomendaciones de los oficiales examinadores. Examinó todo el contenido de la declaración ambiental, y evaluó si efectivamente se cumplía con los estándares ambientales pertinentes. Discutió, además, los señalamientos esgrimidos en contra del proyecto en las vistas, que fueron reiterados en el informe del panel examinador. La Junta incluso ordenó que se incorporara a la declaración de impacto ambiental preliminar los comentarios críticos sobre ésta relativos a los aspectos ambientales del proyecto que fueron formulados por personas particulares, agencias gubernamentales y otras entidades. Todo ello nos convence que la evaluación ambiental de la Junta de Calidad Ambiental fue responsable, independiente, razonable y por tanto, merecedora de nuestra deferencia, debido a la especialización en

---

[13] Corresponde la discusión, al error 2 de SURCO.

cuestiones ambientales del foro administrativo apelado.  Examinado en su totalidad el expediente administrativo de este caso, no podemos concluir que la actuación de la Junta de Calidad Ambiental fue arbitraria o irrazonable, o que fue contraria a las normas jurídicas aplicables.  Fac. C. Soc. Aplicadas, Inc. v. C.E.S., supra;  Metropolitana S.E. v. ARPE, supra.  El error no fue cometido.

Otro error alegado por SURCO, es que la determinación de la Junta de Calidad Ambiental no está sostenida por evidencia sustancial.[14]  Esta alegación se basa en que la Junta no acogió determinadas conclusiones señaladas en el informe del panel examinador que presidió las vistas. Adujo SURCO que, aunque la Junta de Calidad Ambiental no estaba obligada por el susodicho informe, si difería del mismo, tenía que fundamentar sus conclusiones en prueba que fuera más allá de considerar como bueno el contenido de la declaración de impacto ambiental.

Observamos que en su informe, el panel examinador recomendó que se corrigiesen algunas deficiencias que en su criterio tenía la declaración de impacto ambiental preliminar.  Entre ellas, el panel examinador destacó la discusión de las necesidades energéticas de Puerto Rico y de las alternativas para atenderlas; la omisión de discutir el impacto ambiental de la conducción de energía hacia las líneas de la Autoridad de Energía Eléctrica; y la omisión de discutir qué pasaría con la disponibilidad de energía en caso de desastre natural.[15]

Como se sabe, una agencia administrativa no tiene que acoger la totalidad del informe del panel examinador, sino las partes de aquél que considere correctas.  Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194 (1984).  La Junta de Calidad Ambiental, pues, no venía obligada a acoger todas las recomendaciones del panel, sino sólo aquellas que ésta considerase procedentes.  La Junta, sin embargo, le dio ponderada atención a las recomendaciones del panel. Aquí las recomendaciones referidas del panel examinador eran en realidad compendios de las comparecencias de los

---

[14] Corresponde la discusión, al señalamiento de error número 6 de SURCO.

opositores del proyecto en cuestión. Dichas recomendaciones se referían específicamente a apreciaciones de peritos cuyo análisis difería del de los peritos de los proponentes del proyecto. En su Resolución sobre la declaración de impacto ambiental preliminar, la Junta de Calidad Ambiental identificó de modo claro las recomendaciones aludidas del panel examinador y luego procedió a examinarlas y discutirlas. Señaló también las secciones de la declaración preliminar en las cuales dichas recomendaciones fueron atendidas. La Junta explicó además porqué las recomendaciones aludidas estaban debidamente atendidas en la declaración preliminar, formulando sus razones en apoyo de ello. La Junta de Calidad Ambiental, pues, hizo lo que en ley le correspondía hacer: consideró y analizó detalladamente las recomendaciones aludidas y pasó juicio ponderado sobre ellas.

Como hemos señalado antes, no le corresponde a este Foro sustituir nuestro criterio por el de la Junta de Calidad Ambiental en cuanto a los méritos de los asuntos en cuestión, que tratan esencialmente de conflictos periciales sobre controversias ambientales. Nuestra revisión judicial se limita a verificar que la Junta en efecto haya examinado y discutido razonablemente las controversias aludidas. Eso hemos hecho y no podemos concluir que la Junta haya errado al proceder como lo hizo. La Junta cumplió correctamente aquí con el deber que le impone la Ley 9.

Más aun, al incluir su Resolución como parte de la declaración de impacto ambiental final, e incluir también con ésta los comentarios de personas, agencias gubernamentales y otras entidades, la Junta de Calidad Ambiental puso en conocimiento de todos los concernidos las objeciones u observaciones críticas que existían respecto a la declaración preliminar. De este modo complementó y profundizó el análisis que se había hecho en ésta, y trajo a la atención de la agencia proponente y otros las cuestiones ambientales adicionales que se han suscitado en torno al proyecto, cumpliendo así también con los dos propósitos esenciales de la declaración de impacto ambiental, que identificamos antes. Reiteramos

---

[15] Señaló otras deficiencias, las cuales serán discutidas próximamente.

aquí que la declaración final de impacto ambiental es sólo un instrumento de planificación y no la decisión final de la agencia que propone un proyecto. Para tales fines, la discusión de la Junta de Calidad Ambiental de los señalamientos críticos del panel examinador ya reseñada es adecuada y cumple con los requisitos legales pertinentes.

Para ilustrar lo que acabamos de indicar respecto a la consideración que le dio la Junta de Calidad Ambiental a las recomendaciones del panel examinador, conviene examinar concretamente aquí ahora una de ellas. Otras se discuten más adelante en esta opinión.

El panel examinador recomendó que en la declaración de impacto ambiental final se debía discutir con más detalles el asunto de la necesidad del proyecto. Se indicó que en las vistas públicas se había cuestionado si eran válidos los señalamientos de la Autoridad de Energía Eléctrica sobre la futura necesidad energética del país. Esta recomendación del panel examinador dio lugar a que SURCO, en su solicitud de revisión ante nos, planteara como su décimo (10) señalamiento de error la postura de la Autoridad de Energía Eléctrica sobre el particular.

En respuesta a esta recomendación del panel examinador, la Junta de Calidad Ambiental en su Resolución referida indicó que la entidad gubernamental encargada de asegurar que el país contase con una capacidad generatriz de energía eléctrica que fuese adecuada no era la Autoridad de Energía Eléctrica sino la Administración de Asuntos de Energía (AAE). La Junta señaló entonces que esta entidad le había comunicado su determinación de que Puerto Rico necesitaba una capacidad generatriz adicional a la actual. Añadió la Junta que la AAE había estimado el aumento necesario en la capacidad generatriz en diferentes cantidades, de acuerdo a tres escenarios de crecimiento económicos distintos. Así pues, según la AAE para el año 2002 la isla necesitaría 1730MV adicionales de electricidad si se daba el crecimiento económico máximo previsto y 320MV si sólo ocurría el crecimiento mínimo contemplado. La Junta identicó además los factores utilizados por la AAE para realizar sus pronósticos.

Como puede observarse, la Junta de Calidad Ambiental respondió positivamente a la recomendación del panel examinador. Proveyó detalles adicionales sobre el asunto en cuestión, tal como lo había sugerido el panel. En efecto, indicó que la necesidad de aumentar la capacidad energética del país había sido determinada no sólo por la Autoridad de Energía Eléctrica sino también por la misma Administración de Asuntos de Energía con base a sus propios criterios. Más aun, la Junta expresamente indicó que oportunamente la Autoridad de Energía Eléctrica tendría que solicitar el permiso correspondiente de la AAE para aumentar su capacidad generatriz total y cumplir entonces con todos los requisitos necesarios para que se apruebe dicha solicitud.

La Junta, pues, cumplió razonablemente con su responsabilidad de identicar y discutir la cuestión referida, al grado que corresponde hacerlo en una declaración de impacto ambiental, que como hemos expresado ya, es sólo un instrumento de planificación, que no constituye la aprobación o desaprobación del proyecto propuesto. Tampoco puede este Tribunal en revisión judicial entrar en los méritos de la cuestión de si Puerto Rico necesitará más energía eléctrica en el futuro cercano. Nuestro rol se limita a constatar si la Junta desempeñó razonablemente la función particular que le corresponde a dicha agencia sobre dicho asunto.

Una intervención substantiva nuestra en los méritos de la cuestión aludida invadiría las prerrogativas de las ramas políticas del gobierno. Son éstas las que tienen la autoridad para determinar la política pública energética del país, cuya conveniencia es en esencia lo que SURCO realmente cuestiona ante nos. La Asamblea Legislativa de Puerto Rico creó la Administración de Asuntos de Energía precisamente para desarrollar e implantar la política pública referida, y esta entidad ha determinado que existe la necesidad de aumentar significativamente la futura capacidad generatriz de la isla. No puede este Foro adjudicar si tal determinación es correcta. No le corresponde a los tribunales pasar juicio sobre la deseabilidad, sensatez o corrección de la política pública que fijan la legislatura o el ejecutivo. Roig v. Junta Azucarera, 77 D.P.R. 342, 357

(1954); Taboada v. Rivera Martínez, 51 D.P.R. 253 (1937). Los tribunales no son árbitros de la política pública. State v. Brady, 137 P.2d 206, 214 (1943). Resolvemos, pues, que no se cometieron los errores señalados.

Los apelantes también han señalado como error que la planta de carbón y la declaración de impacto ambiental[16] no cumplen con los objetivos de la Ley 9, supra, en particular, con el artículo 4(c) de ésta. En esencia, sostienen que la declaración de impacto ambiental es incompleta y deficiente porque no considera el impacto a la salud de las personas vecinas al área de ubicación propuesta para la planta, lo cual es contrario a los objetivos de la ley. Para fundamentar esta alegación, aducen que el modelo de simulación de dispersión (o análisis de riesgo) utilizado por la Junta de Planificación para calcular computadorizadamente la contaminación atmosférica, parte de premisas inadecuadas, lo que hace que los resultados del análisis sean extremadamente optimistas. No tiene razón.

El análisis de salud humana contenido en la declaración de impacto ambiental es extenso, y está regido por los modelos y las técnicas recomendadas por la Environmental Protection Agency. Ni la ley, la jurisprudencia o los reglamentos ambientales, exigen un análisis matemático preciso o perfecto, que garantice que el proyecto propuesto no ha de tener impacto ambiental adverso alguno. Columbia Basin Land Protection Ass'n v. Schesinger, supra. Lo que se persigue es que la declaración de impacto ambiental provea información suficiente que ponga en perspectiva las consecuencias, tanto favorables como desfavorables, de la acción gubernamental propuesta. La declaración de impacto ambiental

---

[16] Corresponde esta discusión a los errores A y 1 de Misión Industrial y SURCO, respectivamente. Observamos que varios de los errores señalados por los apelantes se formularon respecto a la declaración de impacto ambiental preliminar. Recuérdese que la revisión judicial es respecto a la declaración de impacto ambiental final. Sin embargo, en vista de que el contenido de las declaraciones de impacto ambiental preliminar y final son similares (con la diferencia de que en la final están incluidos los comentarios de personas y agencias y la resolución de la Junta de Calidad Ambiental que la analiza), las deficiencias alegadas por los apelantes respecto al contenido de la declaración preliminar, las haremos extensivas a la declaración final, pues el cuerpo sustantivo de la declaración de impacto ambiental preliminar permaneció inalterado.

referido cumple con estos propósitos, en lo que se refiere a la planta de carbón. No es nuestro rol cuestionar los fundamentos científicos utilizados para ello, sobre todo cuando son los que ha recomendado la agencia federal con expertise en las materias ambientales. Los propios apelantes señalan que los análisis de riesgo están sujetos a inmensas variaciones e incertidumbre científica, debido a la cantidad de variables que se deben presumir o aceptar. Las variables usadas en la declaración de impacto ambiental son las aceptadas por las agencias con peritaje, por lo que no podemos resolver que su uso por la Junta de Calidad Ambiental constituye una arbitrariedad.

SURCO también señaló como error que el análisis de costo-beneficio contenido en la declaración de impacto ambiental es deficiente, por ser incompleto e incorrecto.[17] Sostiene que no se cumple con la Orden Ejecutiva del Gobernador de Puerto Rico de 28 de diciembre de 1993, que declara, como parte de la política pública energética del país, que al considerar la adopción de fuentes alternas para generar energía eléctrica, se haga un balance entre las consideraciones ambientales, de salud y de seguridad pública por un lado, y las consideraciones económicas por otro. Sobre este señalamiento de error debe notarse que el Reglamento sobre Declaraciones de Impacto Ambiental, supra, a pesar de haber sido adoptado antes de la orden ejecutiva referida, es afín a ésta,[18] y se observó sustancialmente en las partes pertinentes de la declaración de impacto ambiental que estamos revisando. Para llevar a cabo el análisis en cuestión se utilizó el modelo que para tales efectos utiliza la Administración de Asuntos de Energía de Puerto Rico para medir los

---

[17] Corresponde la discusión, al error 11 de SURCO.

[18] Los incisos D, J y H, de la sección 5.3. 6, exigen que se discuta en cada declaración de impacto ambiental, la interferencia del uso propuesto con otros usos potenciales de las generaciones futuras, los factores socioeconómicos de la acción y "un análisis que considere los efectos ambientales de la acción propuesta, las medidas necesarias y disponibles para evitar o reducir los efectos ambientales adversos y los beneficios a derivarse de dicha acción", respectivamente.

impactos de las nuevas plantas generatrices,[19] lo que no es irrazonable. Los apelantes cuestionan, además, la procedencia de ciertas cifras utilizadas en el análisis, que fueron provistas por la Autoridad de Energía Eléctrica, pero tales cifras son producto del conocimiento especializado de esa agencia, y no hay nada en los autos del caso que nos induzca a pensar que son erróneas. Aquí, de nuevo, no hay indicios de conducta arbitraria por la Junta, que justifique nuestra intervención. El error alegado no fue cometido.

Otro planteamiento de los apelantes es que, luego de haberse celebrado las vistas públicas, ellos le refirieron a la Junta de Calidad Ambiental dos informes alegadamente pertinentes, que "no se tomaron en consideración".[20] Uno de ellos, que era de tipo preliminar, y había sido comisionado por el Departamento de Educación, versa sobre los problemas de salud en la Escuela Ramona Mendoza Santos. Otro, encargado por la Administración de Asuntos de Energía, versa sobre los problemas ambientales y de salud en ciertas escuelas y en el Barrio Jobos de Guayama.

A las vistas públicas comparecieron tres peritos en medicina, cuyas opiniones fueron contrarias a las conclusiones de los referidos informes. Además, la Administración de Asuntos de Energía endosó el proyecto y el Departamento de

---

[19] Dentro de la discusión del error, los apelantes cuestionan el método escogido, ya que existen otros métodos de análisis. Esto es materia del expertise de las agencias, así que no estamos en condición de intervenir. No tenemos por qué especular respecto a cuáles resultados se hubiesen obtenido utilizando otro modelo de análisis. Baltimore Gas & Electronic Co. v. NRDC, 462 US 87 (1982).

[20] Corresponde la discusión, a los señalamientos de error E y 9 de Misión Industrial y SURCO, respectivamente.

Educación, no se opuso a éste, a pesar de que se le brindó la oportunidad de hacerlo. Según señalamos antes, para determinar si la Junta de Calidad Ambiental cumplió o no con el mandato de la Ley 9, no nos corresponde dilucidar quién tiene razón entre diversas opiniones científicas conflictivas. Izaak Walton League of America v. Marsh, supra. Para atender este señalamiento de error de los apelantes, tendríamos que decidir cuáles peritos tienen la razón, lo que rebasa el ámbito propio de la revisión judicial, siendo ésta una materia altamente especializada. Además, los apelantes tampoco nos ponen en posición de hacer tal evaluación, pues sus señalamientos al respecto son puramente abstractos. La función de dirimir conflictos en peritaje científico le compete a la agencia con expertise en el área ambiental, es decir, a la Junta de Calidad Ambiental. Dicha agencia optó por avalar el análisis de riesgo a la salud preparado por la Junta de Planificación y el curso de acción tomado por ella fue uno razonable y apoyado en el expediente. No se cometió el error.

Pasando a otro asunto, según la declaración de impacto ambiental aprobada por la Junta de Calidad Ambiental, AES proyecta dragar parte de la Bahía Puerto Las Mareas, para construir allí un muelle especializado para recibir las materias primas a utilizarse en la planta proyectada. Misión Industrial señaló como error que no se examinaron los efectos a mediano y largo plazo de tal acción en las cercanías a las áreas a dragarse, los efectos acumulativos y el efecto sobre especies en peligro de extinción.[21] Tampoco tiene razón. En la declaración de impacto ambiental se discuten y evalúan las otras alternativas de localización para el puerto, además, se hizo un estudio de la flora y fauna del lugar. En dicha bahía existe un puerto que es utilizado por otras industrias para transportar materiales y que para tales efectos, es dragado periódicamente. La evaluación hecha por la Junta de Planificación y

---

[21] Corresponde la discusión, a parte del error F de Misión Industrial.

sostenida por la Junta de Calidad Ambiental es suficiente, razonable y sostenida por el expediente, por lo que el error no fue cometido.

Misión Industrial también señaló como error que la consideración de las alternativas a la planta de carbón es superficial y somera; además, que se debieron considerar con más detalle y objetividad otras alternativas.[22] Este error tampoco fue cometido. La declaración de impacto ambiental contiene información sobre las diversas fuentes de energía que fueron consideradas, las alternativas de ubicación de la planta, las posibles tecnologías de combustión y las alternativas de diseño para la planta. Las alternativas comparadas fueron: fuentes de energía renovable, energía hidroeléctrica, energía de biomasa, desperdicios sólidos municipales, energía eólica, energía solar, energía de las mareas, energía térmica del océano, almacenamiento de energía, conservación de energía, combustibles fósiles, petróleo, orimulsión, gas natural licuado y carbón de piedra. Sobre éstas se discutió su confiabilidad, costo económico y asuntos ambientales. Se indicó que se seleccionó el carbón de piedra por diversas razones.[23] Se discutieron también, alternativas de ubicación.[24] Coincidimos con la agencia apelada en que la discusión aludida fue adecuada y que le provee a la agencia proponente la información necesaria para que ésta tome una decisión apropiada. Como hemos indicado antes, no era necesario incluir toda alternativa imaginable. Robertson v. Methow Valley Citizens Council, supra.

Pasemos ahora a examinar los señalamientos de error que tienen que ver con cuestiones ambientales específicas.

---

[22] Corresponde la discusión, al error C de Misión Industrial.

[23] Las razones expuestas por la Junta de Planificación son: la Política Pública Energética suscrita por el Gobernador, la cual promueve la diversificación de combustible, incluyendo combustibles fósiles como el carbón; la abundancia de este combustible en el mercado mundial y su precio competitivo; el que se establece que el uso de la caldera propuesta permite la quema limpia y eficiente del carbón y; el que la transportación y manejo del carbón no presenta riesgo de seguridad.

[24] Dichas alternativas fueron: Guánica, Salinas, Peñuelas, Yabucoa y Guayama.

IV

La Junta de Planificación, en la declaración de impacto ambiental hizo una extensa discusión sobre el posible impacto ambiental que conllevaría la construcción de la planta de carbón. La declaración detalla, mediante subdivisiones, los impactos a la tierra, al agua, al aire, a los recursos naturales y a la comunidad. Cada subdivisión contiene una descripción de los posibles efectos que se producirían sobre cada uno de los elementos antes mencionados. En la declaración se discute además, las distintas fuentes de energía que fueron consideradas como posibles alternativas a la seleccionada. Se explican también las diversas tecnologías de combustión del carbón de piedra y las posibles configuraciones de diseño para la planta y para otras instalaciones necesarias para su operación. Se describen, además, los cinco lugares que fueron considerados como posibles sedes alternas para la ubicación de la planta cogeneratriz. Finalmente, la declaración de impacto ambiental expone los impactos inevitables, irrevocables o irreparables que tendrá la construcción y operación de la planta de cogeneración en cuanto a los recursos de la tierra, el agua, el aire, los recursos naturales y los recursos de la comunidad.

Los apelantes dirigen gran parte de sus señalamientos de error a cuestionar la suficiencia de la declaración de impacto ambiental respecto a su discusión de los posibles impactos ambientales. Por ello, examinaremos a continuación por separado los señalamientos de error relacionados con los elementos referidos.

A. Agua:

Señalaron los apelantes que la declaración de impacto ambiental no examina adecuadamente los impactos del proyecto propuesto respecto a recursos de agua, incluyendo los abastos de determinadas aguas

subterráneas, y sobre la agricultura.[25],[26]  Alegaron además, que no hay evidencia real para sostener que la Autoridad de Acueductos y Alcantarillados vaya a aumentar el volumen de descarga de agua de su planta de tratamiento regional de Guayama, como lo requiere la operación de la planta de carbón, según lo indicado en la declaración de impacto ambiental.  Sin embargo, en la declaración de impacto ambiental se discuten detalladamente las distintas fuentes de agua que usaría la planta, indicando cuáles serían fuentes principales y cuáles serían fuentes auxiliares.  También se examinan los rendimientos actuales de esas fuentes y su disponibilidad futura.  Incluso se trata la localización de pozos y su relación con un acuífero.  Se señala enfáticamente que la fuente principal de agua para el uso industrial de la planta será el afluente de la planta de tratamiento y que este proceso permitirá eliminar el uso de agua marina y minimizar el uso de abastos de agua potable.  No podemos concluir que el análisis aludido no es razonable.  Ciertamente no nos corresponde especular sobre qué pasaría si, en efecto, las proyecciones aludidas sobre abastos de agua no se llegaran a materializar, porque ello está fuera del ámbito de nuestra función revisora.  Véase, Robertson v. Methow Valley Citizens Council, supra.  Debemos enfatizar que una declaración de impacto ambiental no tiene que cubrir todas las posibilidades imaginables.  Además, como hemos señalado ya, si lo proyectado no llegase a ocurrir y ello resultase en daños ambientales imprevistos, existen numerosos remedios legales para atender el asunto. Concluimos, por tanto, que los errores señalados no fueron cometidos.

---

[25] Corresponde la discusión, a parte del error F de Misión Industrial y al error 3 de SURCO.

[26] Según la propuesta de AES, la planta usaría agua para enfriamiento. Proyecta obtenerla de las aguas tratadas, provenientes de una planta que la Autoridad de Acueductos y Alcantarillados se propone ampliar y de ser necesario, de las aguas usadas por la fábrica Phillips Puerto Rico Core y del proyecto de Superfondo de la fábrica de Fibers (dicha agua está contaminada, tratada bajo la supervisión de la EPA).  De forma suplementaria, se usaría el agua proveniente del Canal de Patillas. También proyecta usar un sistema de recirculación de agua.

B. <u>Efectos sinergísticos de las emisiones de la planta: Aire</u>

SURCO planteó que, como el carbón mineral que utilizará la planta propuesta contiene azufre, que en su estado gaseoso es venenoso y afecta nocivamente a la salud humana, aun cuando se han fijado normas regulatorias del porcentaje de emisiones de éste que puede ir al aire, es imposible concluir, como concluyó la Junta de Planificación en la declaración de impacto ambiental, que las emisiones resultantes no tendrán efectos sobre el promedio de vida y en el aumento de mortandad en las comunidades cercanas a la ubicación de la planta.[27] Adujo que no hay manera de realizar una quema, ni completa, ni perfecta, de este combustible. Señaló que a la emisión de azufre hay que sumarle la influencia perjudicial que crean las emisiones de benceno que genera la vecina fábrica Phillips. Tampoco tiene razón.

---

[27] Corresponde la discusión, al error número 5 de SURCO.

En el análisis de impacto a la calidad del aire que contiene la declaración de impacto ambiental se utilizaron los modelos y los estándares establecidos en los reglamentos federales y estatales. El modelo de simulación de dispersión atmosférica fue desarrollado con datos ambientales de la

calidad del aire tomados de una muestra en el área de Guayama, a fin de simular las condiciones ambientales existentes. Se utilizaron como contaminantes criterio: el bióxido de azufre, el bióxido de nitrógeno y la materia sólida particulada. El resultado arrojado por el modelo de dispersión fue que el estimado de concentraciones ambientales de la planta proyectada está por debajo del nivel permitido por los estándares aplicables de calidad del aire. Se especificó en la declaración de impacto ambiental, que los impactos estimados para la planta propuesta[28] fueron sumados a las concentraciones ambientales existentes, para luego compararlos con las normas reglamentarias.

Ciertamente, el proceso de generar energía mediante la combustión del carbón de piedra produce varios compuestos que son nocivos a la salud y a la calidad del medio ambiente. Es por ello que las agencias federales y estatales concernidas han establecido unos parámetros para controlar la cantidad que de estos compuestos puede estar presente en el aire, sin que por ello resulte amenazada la vida humana. Los parametros aludidos han sido fijados en abstracción de la planta particular que aquí nos concierne, como norma general, y no nos compete en este caso dilucidar la validez o sabiduría de tales parámetros. El modelo utilizado en la preparación de la declaración de impacto ambiental demuestra la conformidad del proyecto propuesto con dichos parámetros, y que se utilizaron datos reales de la calidad del aire que actualmente se respira en el área de Guayama, a los cuales les fueron sumados los estimados de emisiones que produciría la planta. La Junta de Calidad Ambiental, pues, verificó que en la declaración de impacto ambiental se detalló el problema

ambiental que acarrea la quema de carbón propuesta, y que en el diseño de la planta propuesta se han identificado los medios para evitar la contaminación adversa.

Debe enfatizarse aquí que la Junta tendrá ocasión más adelante para asegurarse que las expectativas aludidas contenidas en la declaración de impacto ambiental en cuestión se cumplan. En el proceso de permisos de emisiones se verificará concretamente que la quema de carbón que nos concierne se realizará conforme a los requerimientos de protección ambiental pertinentes. Concluimos, por consiguiente, que en esta fase de planificación ambiental, el error señalado no fue cometido.

C. Disposición de cenizas:

Ambos apelantes han señalado que la declaración de impacto ambiental no considera, ni las implicaciones, ni las consecuencias ambientales de las cenizas que generaría la planta, ni tampoco la disposición de éstas.[29] Sostienen que dicha disposición no puede dejarse a discreción de una entidad privada, ya que esto significaría un riesgo para la salud del pueblo de Puerto Rico, para el medio ambiente de Guayama y del lugar en donde se disponga de las cenizas.

En cuanto a este punto, la Junta de Calidad Ambiental concluyó que la ceniza resultante de la combustión del carbón de piedra es un material inerte, que no es tóxico, reactivo, corrosivo, ni flamable. No está clasificada como un material peligroso. Por ello, en la declaración de impacto ambiental no se discutió su posible impacto ambiental, dado que no es nocivo ni perjudicial al ambiente, aunque se incluyó lo relativo a la ceniza en la descripción del proyecto. Concretamente, en la declaración de impacto ambiental se expuso que la ceniza se procesaría para producir tres productos secundarios con utilidad en las industrias de construcción, minería y agricultura. Se expresó además, que ni la ceniza, ni sus

---

[28] El carbón de piedra que se utilizaría, según la propuesta, es uno con un porciento máximo de azufre de 1% y con base en esta cifra se hizo el estimado.

[29] Corresponde a los errores G y 8 de Misión Industrial y SURCO, respectivamente.

derivados, serían depositados como desperdicios sólidos en los vertederos de Puerto Rico. Finalmente, la Junta de Calidad Ambiental, al aprobar la declaración en cuestión, dispuso que de no encontrarse cliente para las cenizas aludidas, se requerirá que las mismas sean devueltas a las minas de origen del carbón. En esta etapa del desarrollo propuesto, las determinaciones de la Junta son suficientes en lo que respecta a aprobar la declaración en cuestión, por lo que no debemos intervenir con la decisión de la Junta de Calidad Ambiental. El error alegado no fue cometido.

D. Extracción de piedra caliza:

Misión Industrial señaló como error que en la declaración de impacto ambiental no se considerasen los impactos ambientales de la extracción total o parcial de piedra caliza proveniente de mogotes u otros sectores de Puerto Rico.[30]

La declaración de impacto ambiental establece que el diseño de la planta se hizo tomando en consideración el uso de piedra caliza de las Bahamas, la cual ha sido sometida a pruebas, tanto por el proyectista, como por los fabricantes de las calderas que usará la planta. Se especifica también, que la compra de la piedra caliza se hará en el mercado mundial y que se podría adquirir ésta en Puerto Rico, ya que en la Isla hay canteras que extraen piedra caliza para la venta. En relación a este punto, en la declaración de impacto ambiental se señala que AES no desarrollará canteras para extraer piedra caliza en Puerto Rico. Esto, unido al hecho de que ya existe en nuestro país una industria dedicada a la extracción de piedra caliza, la cual está altamente reglamentada, hace innecesaria toda consideración ulterior de un posible impacto ambiental sobre eventos no contemplados en el proyecto propuesto. El error no se cometió.

---

[30] Corresponde la discusión, al error D de Misión Industrial.

V

Luego de atendidos todos los errores alegados, es inevitable confirmar la resolución apelada. La Junta de Calidad Ambiental cumplió con su deber, que no consiste en aprobar o desaprobar el proyecto, sino en decidir si la declaración de impacto ambiental presentada por la agencia proponente (la Junta de Planificación), era adecuada para la acción propuesta. El análisis que hizo la Junta de Calidad Ambiental, según hemos podido comprobar mediante el examen del voluminoso expediente de este caso, es razonable. La Junta de Calidad Ambiental, basándose en su expertise en estos asuntos, evaluó la declaración de impacto ambiental presentada por la Junta de Planificación y determinó que ésta cumplió con los requisitos legales pertinentes. Hemos comprobado que en la declaración de impacto ambiental se detallaron los impactos ambientales significativos que acarrearía la construcción y operación de la planta de cogeneración en cuestión. Dicha declaración de impacto ambiental fue publicada y circulada de conformidad con los procedimientos establecidos en la ley. La Junta de Calidad Ambiental recibió los comentarios de las partes que se oponían al proyecto y finalmente decidió que la declaración de impacto ambiental cumplía con los requisitos de la Ley sobre Política Pública Ambiental. Según los estudios presentados por la Junta de Planificación y considerados como correctos por la Junta de Calidad Ambiental, se siguieron los parámetros de la Environmental Protection Agency respecto a los contaminantes. La decisión de aprobar la declaración de impacto ambiental está debidamente fundamentada. La Junta de Calidad Ambiental no estaba otorgando un permiso o imponiendo la decisión de construir o no la planta de energía en cuestión, sino evaluando si, en efecto, la declaración ambiental presentada por la Junta de Planificación era adecuada para acreditar que la agencia proponente tomó en consideración las cuestiones ambientales, según requerido por la Ley 9.

Resolvemos, pues, que la decisión de la Junta de Calidad Ambiental, al aprobar la declaración de impacto ambiental referida, no fue arbitraria ni caprichosa.

Reiteramos que nuestro dictamen ahora no impide que oportunamente, de ser procedente, se examine judicialmente si se han cumplido bien las expectativas de protección ambiental y de conservación y uso racional de los recursos naturales contenidas en la declaración de impacto ambiental referida.

Se dictará sentencia para confirmar la Resolución emitida por la Junta de Calidad Ambiental el 8 de abril de 1996.


Jaime B. Fuster Berlingeri
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


MISION INDUSTRIAL DE P.R.
INC. Y OTROS

    Apelantes

      vi.                     AA-96-40
                                AA-96-41

JUNTA DE CALIDAD AMBIENTAL
DE P.R. Y OTROS

    Apelados


SENTENCIA


San Juan, Puerto Rico, a 29 de junio de 1998.


       Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente sentencia, se confirma la Resolución emitida por la Junta de Calidad Ambiental el 8 de abril de 1996.

       Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton disiente con opinión escrita a la cual se une la Juez Asociada señora Naveira de Rodón. El Juez Asociado señor Negrón García está inhibido.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Misión Industrial de
Puerto Rico, Inc. y Otros

    Apelante

                             AA-96-40
    v.                          AA-96-41

Junta de Calidad Ambiental
de P.R. y otros

    Apelados


Opinión Disidente emitida por el Juez Asociado señor Hernández Denton a la cual se une la Juez Asociada señora Naveira de Rodón


San Juan, Puerto Rico, a 29 de junio de 1998.

Al evaluar la resolución emitida por la Junta de Calidad Ambiental en la que determinó que la Declaración de Impacto Ambiental en torno a la planta de cogeneración de energía eléctrica propuesta para el Municipio de Guayama cumple con la Ley Sobre Política Pública Ambiental, este Tribunal no aplica apropiadamente el criterio de revisión judicial que corresponde a controversias como la que plantea el presente caso. Además, evalúa la decisión apelada y la Declaración de Impacto Ambiental sometida por la Junta de Planificación desde una óptica en extremo laxa, incumpliendo así la función indelegable que tienen los tribunales en controversias de índole ambiental de velar que las agencias realicen un análisis riguroso sobre las

consecuencias ambientales de sus acciones. En consecuencia, este Tribunal

abdica su rol de velar por el cumplimiento estricto del delicado esquema estatutario diseñado para acatar el mandato constitucional de proteger nuestros recursos naturales y como resultado de ello, confirma la resolución apelada aún cuando la Declaración de Impacto Ambiental sometida por la Junta de Planificación adolece de serias deficiencias que requieren que sea suplementada. Por ello, disentimos.

I.

La compañía Allied Energy Systems Puerto Rico, L.P., [en adelante A.E.S.], presentó en octubre de 1994 una consulta de ubicación ante la Junta de Planificación de Puerto Rico en la que propuso la construcción de una planta de cogeneración de energía eléctrica en el Barrio Jobos del Municipio de Guayama a un costo aproximado de 650 millones de dólares. La planta propuesta contempla usar carbón de piedra como materia prima.

Como parte del proceso correspondiente para la construcción y operación de la planta de cogeneración, A.E.S., a través de la Junta de Planificación de Puerto Rico como entidad proponente, presentó ante la Junta de Calidad Ambiental una Declaración de Impacto Ambiental Preliminar [en adelante D.I.A.- Preliminar].

Para evaluar esta D.I.A.-Preliminar, la Junta de Calidad Ambiental realizó vistas públicas durante los días 15 y 22 de julio de 1995. Eventualmente, el 4 de marzo de 1996, dicha entidad emitió una resolución en la que concluyó que la D.I.A.-Preliminar cumplía con los requisitos del Art. 4 (c) de la Ley Sobre Política Pública Ambiental y el Reglamento sobre Declaraciones de Impacto Ambiental. Una moción de reconsideración presentada oportunamente por los apelantes fue declarada no ha lugar por la Junta de Calidad Ambiental. De esta determinación, miembros de la comunidad en donde se vislumbra ubicar la planta de cogeneración de energía eléctrica organizados como la entidad Sur Contra la Contaminación, Inc., [en adelante SURCCO, Inc.] y la organización Misión Industrial Inc., acudieron por separado ante nos. Oportunamente consolidamos los recursos.

Ante nos SURCCO plantea la comisión de doce (12) errores.[31] Misión Industrial, por su parte, planteó la comisión de siete (7) errores.[32] Todos ellos, cuestionan aspectos sustantivos o aspectos procesales de la resolución emitida por la Junta de Calidad Ambiental. Hoy, este Tribunal confirma la resolución apelada. Al hacerlo, no define los parámetros adecuados de revisión judicial y asume una postura en extremo laxa, que sugiere que este Tribunal ha abdicado su rol de salvaguardar el esquema estatutario que recoge la política pública ambiental del Estado. En ausencia de una discusión adecuada que ilustre el alcance de la revisión judicial y que asuma una postura de mayor fiscalización al evaluar la

---

[31] Los errores señalados por SURCCO son los siguientes:

1.  La planta de carbón en la zona propuesta y la D.I.A.-P no cumplen con los objetivos de la Ley Sobre Política Pública Ambiental.
2.  El aval que la JCA le ha dado a la D.I.A.-P está viciado de error porque restringe su función a comentar sólo si el análisis del impacto ambiental que se esboza en la D.I.A.-P es adecuado o no.
3.  Las fuentes de extracción de 6 millones de galones de agua que necesitará la planta no quedan aclaradas en la D.I.A.-P ni en la resolución de la JCA.
4.  La A.E.S. y la agencia proponente no demostraron que existiera compromiso para vender vapor de agua a alguna industria y así cumplir con los requisitos del estatuto "Public Utility Regulatory Policy Act" (PURPA).
5.  El contenido de la D.I.A.-P falla en discutir los efectos sinergísticos que pueden ocurrir al añadirse las emisiones de la A.E.S. a los contaminantes diversos ya existentes.
6.  La resolución de la JCA no está sostenida en la prueba aportada durante las vistas ofrecidas.
7.  La D.I.A.-P no cumplió con el Art. 5.3.1 del Reglamento (3106) de la JCA y con la Orden y Sentencia de interdicto del caso de Reinaldo Morales Ruiz y otros vs. AEE y otros Civil Núm. Rpe93-0618, sobre Mandamus, emitida por el Tribunal de Instancia, Sala Superior de San Juan.
8.  La D.I.A.-P no cumple con la política ambiental al no disponer de un plan específico para disponer de las miles de toneladas de cenizas diarias que genera la planta de carbón.
9. A pesar de habérsele informado a la JCA de sendos informes en posesión del Departamento de Educación [...] que ameritaban reabrir la discusión de la D.I.A.-P, la agencia soslayó el planteamiento y ningún pronunciamiento hizo sobre el particular. [...]
10. Según la información aparcelada que ha ofrecido la propia Autoridad de Energía Eléctrica, en la que afirma que serán necesarios unos 1,000 ó 1,200 megavatios de capacidad generatriz adicional entre los años 2000 a 2003, la totalidad de proyectos que se discuten y las mejoras de la Autoridad de Energía Eléctrica llegarán a triplicar la cantidad de megavatios necesarios.
11. La D.I.A.-P no cumple con el requisito de la Política Energética, Orden Ejecutiva del Gobernador de Puerto Rico del 28 de diciembre de 1993, que requiere un estudio de costo-beneficio. Sólo ofrece datos parciales de algunos beneficios y costos sociales, lo que no constituye un estudio de costo beneficio y menos una conclusión del beneficio o costo neto del proyecto desde una óptica social.
12. La JCA, a pesar que la ubicación de una planta de carbón en los predios del barrio Puente de Jobos de Guayama atenta contra la salud y propiedades de los interventores, no permitió [...] que los proponentes del proyecto estuvieran sujetos a ser contrainterrogados sobre la carencia de información o desinformación de la D.I.A.-P. Escrito de Apelación, a las págs. 3-4.

[32] Los errores señalados por Misión Industrial son:

A. Erró la Junta Apelada al determinar que la Declaración de Impacto Ambiental-Preliminar acataba el Artículo 4(c) de la Ley sobre Política Pública Ambiental.
B. Erró la JCA al no rechazar la D.I.A.-P a pesar de ésta no haber sido redactada o preparada por la agencia proponente
C. Erró la JCA al autorizar la D.I.A.-P a pesar de la ausencia de la consideración de alternativas a la Planta de la AES.
D. Erró la JCA al concluir que la D.I.A.-P había considerado y evaluado conforme a derecho los impactos de la extracción de piedra caliza.
E. Erró la JCA al no considerar o incorporar importante información sobre la salud, previo a su aprobación de la D.I.A.-P.
F. Erró la JCA al concluir que la D.I.A.-P había considerado otros impactos ambientales.
G. Erró la JCA al autorizar la D.I.A.-P sin que se conozcan las consecuencias ambientales de la disposición de cenizas. Escrito de Apelación, a la pág. 8(a).

D.I.A. bajo estudio y la resolución apelada, no podemos refrendar la posición de este Tribunal.

II.

La importancia que los recursos naturales y el ambiente tienen para las generaciones presentes y futuras llevó a nuestros constituyentes a afirmar en nuestra Constitución diáfanamente y sin ambages que "será política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad". Const. de P.R. Art. VI, Sec. 19.

Hemos sido enfáticos al destacar que esta expresión no constituye una mera declaración de principios abstractos. Se trata de un mandato de dimensiones constitucionales cuya importancia en nuestro entorno jurídico y social no debe ser menoscabada. Paoli Méndez v. Rodríguez, Opinión y Sentencia de 5 de mayo de 1995, 138 D.P.R. ___ (1995).

Al interpretar este claro mandato constitucional, recientemente manifestamos que:

> [l]a política pública sobre los recursos naturales expuesta en nuestra Constitución es una protección de lo que comúnmente llamamos "naturaleza". Es una protección frente al Estado, la sociedad, el gobierno, e incluso el hombre, que en el mundo contemporáneo, sin darse cuenta de que está socavando su propia existencia, destruye la naturaleza en aras de un materialismo y un consumerismo [sic] rampante creando desbalances sistémicos irreversibles. Id.

Como modo de concretar y viabilizar esta política pública plasmada en nuestra Constitución, el Estado aprobó la Ley Sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, según enmendada, 12 L.P.R.A. secs. 1121 et seq..[33] Esta ley, en armonía con el mandato constitucional, postula como uno de sus propósitos fundamentales "[e]stablecer una política pública que estimule una deseable y

---

[33] Nuestra Ley Sobre Política Pública Ambiental tomó como modelo la ley federal "National Environmental Policy Act" de 1969, 42 U.S.C.A. 4321 et seq. [en adelante NEPA]. De este modo, la jurisprudencia federal que interpreta dicha ley sirve de marco de referencia para precisar los contornos de nuestra legislación. No obstante, debe quedar claro que por tratarse de derecho estatutario no estamos obligados a darle a nuestra legislación sobre materia ambiental la misma interpretación y alcance que le han conferido los tribunales federales a la NEPA. De igual modo, debemos destacar que toda interpretación sustantiva y procesal que le debemos adscribir al esquema estatutario en materia ambiental debe estar permeada por el hecho de que la protección a los recursos naturales y nuestro medio ambiente en nuestra jurisdicción es de rango constitucional.

conveniente armonía entre **el hombre y su medio ambiente**". 12 L.P.R.A. sec. 1122 (énfasis suplido).[34]

La Ley Sobre Política Pública Ambiental constituye, así, el eje fundamental del esquema estatutario que existe en Puerto Rico sobre nuestro medio ambiente y recursos naturales. En específico, su Art. 4 define la forma en que será implantada dicha política pública al ordenar que todas las leyes y reglamentos sean interpretados, implantados y administrados **en estricta conformidad con la política pública ambiental al máximo grado posible.**

De igual forma, obliga a los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado de Puerto Rico y sus sub-divisiones políticas, a que incluyan con toda propuesta de legislación y antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente, una declaración escrita y **detallada** sobre el impacto ambiental de la legislación o acción propuesta, sobre cualquier efecto adverso al medio ambiente que pudiera tener, las alternativas a la acción propuesta, la relación entre usos locales, así como cualquier compromiso irrevocable o irreparable de los recursos que serían afectados por la acción propuesta. Art. 4(c), 12 L.P.R.A. 1124(c). Este artículo es la fuente estatutaria de donde se deriva la obligación que tienen las agencias y demás entidades gubernamentales de preparar una Declaración de Impacto Ambiental [en adelante D.I.A.] para proyectos que afecten significativamente el medio ambiente. La D.I.A. constituye, de este modo, el instrumento de planificación que permite asegurar que en el proceso decisional gubernamental sea incorporada la política pública ambiental.[35]

---

[34] El texto completo del Art. 2 dispone:

Los fines de este Capítulo son los siguientes: Establecer una política pública que estimule una deseable y conveniente armonía entre el hombre y su medio ambiente; fomentar los esfuerzos que impedirían o eliminarían daños al ambiente y la biosfera y estimular la salud y el bienestar del hombre; enriquecer la comprensión de los sistemas ecológicos y fuentes naturales importantes para Puerto Rico y establecer una Junta de Calidad Ambiental. 12 L.P.R.A. sec. 1122.

[35] Además, como recientemente afirmamos, "[e]sta Declaración no solamente ayuda a la agencia en su proceso decisional, sino que también facilita que las otras entidades públicas y la ciudadanía estén debidamente informadas de las consecuencias

La Ley Sobre Política Pública Ambiental no sólo detalla la forma en que se implantará la política pública estatal sobre el medio ambiente, sino que además, crea la Junta de Calidad Ambiental como organismo gubernamental especializado con facultades de asesoría, fiscalización, supervisión, reglamentación e investigación en torno al medio ambiente y los recursos naturales. La Junta de Calidad Ambiental constituye, así, el organismo gubernamental principal encargado de velar por el fiel cumplimiento de la política pública del Estado sobre el ambiente contenido en el Art. 4 de la Ley Sobre Política Pública Ambiental.[36]

De conformidad con la Ley, la Junta de Calidad Ambiental aprobó el Reglamento Sobre Declaraciones de Impacto Ambiental y un Manual para la Preparación, la Evaluación y el Uso de las Declaraciones de Impacto Ambiental. Estos establecen, entre otras cosas, requisitos procesales y sustantivos que deben ser satisfechos para implantar debidamente el Art. 4 de la Ley sobre Política Pública Ambiental, sección 1.2(c). Además, pautan los requisitos de contenido y administrativos exigibles para cumplir con el proceso de Declaración de Impacto Ambiental dispuesto por el artículo 4 de la Ley, Sección 1.3.[37] El fiel cumplimiento de las disposiciones reglamentarias garantiza que la política pública del Estado en torno al medio ambiente no sea transgredida. Por ello, como custodio del ambiente, la Junta de Calidad Ambiental tiene la obligación ineludible de velar por el estricto cumplimiento de los preceptos de la

---

ambientales de una acción contemplada por el Estado [para que] puedan fiscalizar efectivamente todas las etapas de la acción propuesta". García Oyola v. Junta de Calidad Ambiental, Opinión y Sentencia de 21 de febrero de 1997, 142 D.P.R. ___ (1997) (Op. Disidente, J. Hernández Denton). El supuesto subyacente en todo este esquema en Puerto Rico, al igual que en el proceso equivalente federal, es que se pueden tomar mejores decisiones en torno a los recursos ambientales cuando la ciudadanía observa el proceso. David B. Firestone y Frank C. Reed, Enviromental Law for Non-Lawyers 43 (2da ed. 1993).

[36] De hecho, la Junta de Calidad Ambiental, posee autoridad para expedir órdenes de hacer o de no hacer y de cese y desista para que se tomen aquellas medidas que la propia entidad estime necesarias para preservar el ambiente. 12 L.P.R.A. sec. 1131 (19) y (22).

[37] En este contexto, el Reglamento Sobre Declaraciones de Impacto Ambiental establece que la Declaración de Impacto Ambiental deberá contener un resumen de la acción propuesta con una descripción de los posibles impactos ambientales; Sec. 5.3.4; una descripción general de la acción contemplada, su propósito y necesidad y una descripción del ambiente que podría ser directa o indirectamente afectado por la acción propuesta, sec. 5.3.5; una discusión del probable impacto ambiental de la acción propuesta, según los criterios que el propio reglamento establece; a manera de comparación, deberá presentarse el impacto ambiental de la acción propuesta y de las alternativas, de forma tal que se precisen las cuestiones bajo evaluación y se provean alternativas de selección para los funcionarios y el público, sec. 5.3.7.

Ley Sobre Política Pública Ambiental y las disposiciones reglamentarias aplicables.[38]

Aunque la D.I.A. no constituye una solicitud que deba ser aprobada por la Junta de Calidad Ambiental, esta entidad tiene la ineludible obligación de evaluar "si la D.I.A. Preliminar discute satisfactoriamente los efectos ambientales del proyecto. En particular tiene que examinar la validez científica de la información incluida por la agencia proponente e identificar las áreas que no han sido adecuadamente estudiadas". García Oyola y otros v. Junta de Planificación, supra, (Op. Disidente Juez Hernández Denton).

La resolución final que emite la Junta de Calidad Ambiental en torno a la D.I.A. puede ser objeto de revisión judicial. Así, las partes pueden impugnar ante los tribunales la determinación efectuada por dicha agencia en términos de que la D.I.A. sometida por la agencia en cuestión cumple con la política pública establecida en el Artículo 4(c) de la Ley Sobre Política Pública Ambiental.

Ahora bien, ¿cuál es el alcance de esa revisión judicial?

III.

A.

La revisión judicial de una agencia administrativa en materia ambiental está sujeta a los criterios generales establecidos por el derecho administrativo. De este modo, es preciso conferirle deferencia al foro administrativo, --en este caso la Junta de Calidad Ambiental--, y, conforme lo expresa la propia Ley Sobre Política Pública Ambiental, realizar la revisión judicial a la luz del expediente administrativo y

---

[38] Recientemente, resumimos las etapas por las que debe pasar toda D.I.A. ante la Junta de Calidad Ambiental. García Oyola y otros v. Junta de Planificación, supra, (Op. Disidente Juez Hernández Denton). Conforme al Reglamento de esta agencia, la entidad proponente de una acción que afecte significativamente al ambiente debe preparar una D.I.A.-Preliminar. Esta D.I.A.-Preliminar constituye el documento de trabajo inicial de la agencia proponente que será sometido al escrutinio del público y de las diversas agencias con injerencia como condición previa a la formulación de una D.I.A.-Final. La D.I.A.-Preliminar deberá ser remitida a la Junta de Calidad Ambiental y a las demás agencias con injerencia, así como ponerla a la disposición del público. (Sección 5.5.2.1 del Reglamento). Previa notificación al público, la Junta podrá celebrar vistas públicas. En esta etapa, la Junta de Calidad Ambiental o cualquier otra agencia podrán solicitar información adicional o un suplemento a la D.I.A.-Preliminar "cuando [se] estime que la misma es necesaria para poder llevar a cabo una evaluación adecuada del impacto ambiental de la acción propuesta". Reglamento Sobre Declaraciones de Impacto Ambiental, sección 5.5.2.3.

Tan pronto se realicen las vistas públicas y todas las partes interesadas hayan sometido sus posiciones, la Junta emite sus comentarios. Luego de finalizado este proceso, si la agencia proponente considera que la acción propuesta afecta sustancialmente el ambiente deberá preparar una D.I.A. Final y ponerla a la disposición del Público. Conforme al Reglamento, la Junta de Calidad

sostener las determinaciones de hecho de la agencia si se apoyan en evidencia sustancial. 12 L.P.R.A. sec. 1134(g). Esta ley nada dice en cuanto a las conclusiones de derecho. De este modo, se aplica de forma supletoria la Ley de Procedimiento Administrativo Uniforme que dispone que las conclusiones de derecho de una agencia administrativa son revisables por los tribunales en todos sus aspectos. 3 L.P.R.A. sec. 2175.

Si bien la Opinión del Tribunal reconoce los principios antes enunciados, no los aplica adecuadamente a las controversias que tenemos ante nuestra consideración ya que no distingue entre las controversias que requieren ser examinadas en todos sus aspectos, como cuestión de derecho, y las que requieren que se brinde un trato deferente a la agencia administrativa. En consecuencia, la Opinión del Tribunal no establece claramente cuál es la función de los tribunales al revisar resoluciones de la Junta de Calidad Ambiental como la que tenemos ante nos. Esta omisión es significativa, considerando que son los tribunales los que en última instancia determinan si el Gobierno ha cumplido cabalmente con las disposiciones estatutarias sobre el ambiente.

Somos de opinión que en nuestra jurisdicción la revisión judicial de las decisiones de la Junta de Calidad Ambiental sobre declaraciones de impacto ambiental requiere que los tribunales examinen cuidadosamente si dicha agencia cumplió rigurosamente con el procedimiento establecido en la Ley Sobre Política Pública Ambiental y en su Reglamento sobre Declaraciones de Impacto Ambiental. Según afirmamos en nuestro disenso en García Oyola y otros v. Junta de Planificación, supra, (Op. Disidente, Juez Hernández Denton):

> al examinar una DIA-Preliminar la Junta de Calidad Ambiental debe inicialmente verificar que ésta incluy[e] toda la información requerida por la Sec. 5.3 del Reglamento [Sobre Declaraciones de Impacto Ambiental]. Luego, debe evaluar científicamente el contenido de la DIA-Preliminar para determinar si contiene una discusión adecuada de cada uno de los criterios dispuestos en el Art. 4(c) de la Ley. Por último, debe asegurarse de que la entidad proponente cumpl[ió] estrictamente con el procedimiento provisto en la Ley, el

Ambiental emitirá entonces una resolución en donde determinará si el contenido de la D.I.A. cumple con lo preceptuado en el Art. 4(c) de la Ley Sobre Política Pública Ambiental.

Reglamento y el Manual, particularmente en lo referente a la notificación al público sobre los dos tipos de Declaraciones requeridos por la Ley y el Reglamento. Id.

En revisión, los tribunales deben examinar si la Junta actuó de conformidad con este esquema. La determinación de si la agencia apelada dio cumplimiento al esquema procesal diseñado para la elaboración de una declaración de impacto ambiental es una controversia de derecho revisable en todos sus aspectos. Asimismo, al cuestionarse una determinación de la Junta de Calidad Ambiental en términos de si una Declaración de Impacto Ambiental satisface la Ley Sobre Política Pública Ambiental, los tribunales deben observar la norma de derecho administrativo que requiere sostener las determinaciones de hecho de las agencias administrativas cuando estén basadas en evidencia sustancial. Así, el primer paso al abordar un recurso como el que tenemos ante nuestra consideración es distinguir entre las controversias que requieren ser revisadas en todos sus aspectos, como cuestión de derecho, y las controversias en las cuales se impone un trato deferente hacia la agencia apelada. Eventualmente, el tribunal deberá abordar las controversias aplicando el escrutinio correspondiente a cada controversia.

Ahora bien, el Tribunal Supremo de Estados Unidos ha destacado que las agencias deben efectuar un análisis riguroso de las consecuencias ambientales al tomar decisiones que impacten significativamente el ambiente, ("a hard look at environmental consequences"). Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989); Kleppe v. Sierra Club, 427 U.S. 390, 410 (1976). Aunque la Opinión del Tribunal reconoce lo anterior, no define en qué consiste tal análisis. Tampoco expresa cómo los tribunales garantizarán que las agencias realicen dicho análisis.

Según el Tribunal Supremo Federal, el alcance práctico de la doctrina del "hard look" queda definido del siguiente modo:

> [...] Congress intended that the "hard look" be incorporated as part of the agency´s process of deciding whether to pursue a particular federal action .... As general proposition, we can agree with the Court of Appeals´ determination that an agency must allow all significant environmental risks to be

factored into the decision whether to undertake a proposed action. <u>Baltimore Gas & Electric Co.</u> v. <u>NRDC</u>, 462 U.S. 87, 100 (1983) (citas omitidas).[39]

Aunque el deber primario de hacer este análisis recae sobre la agencia administrativa, los tribunales, como parte de su función revisora, deben asegurarse de que la agencia ha actuado de esa forma. Y es que no puede ser de otro modo. La obligación que se cierne sobre la agencia sólo puede ser efectivamente fiscalizada si el foro que revisa esa determinación realiza similar escrutinio al evaluar la determinación de la agencia.

Nótese que el examen de si la agencia realizó un análisis riguroso de las consecuencias ambientales es enmarcable en los parámetros de revisión judicial que hemos señalado. En el contexto de una declaración de impacto ambiental, el examen riguroso en revisión judicial forma parte del análisis en torno al cumplimiento del esquema procesal que toda agencia debe realizar para evaluar las consecuencias ambientales de sus acciones. No negamos que el deber de realizar un análisis riguroso de todas las consecuencias ambientales de una acción puede involucrar cuestiones mixtas de hecho y de derecho. Sin embargo, como se sabe, ante este tipo de determinación, la norma en revisión judicial es considerar la controversia como una cuestión de derecho, por lo que la actuación administrativa se revisa plenamente.[40] <u>Garriga</u> v. <u>Comisión Industrial</u>, 87

---

[39] Las expectativas de la aplicación del "hard look" por parte de la agencia gubernamental cuando estima que no resulta necesario la elaboración de una declaración de impacto ambiental han sido resumidas del siguiente modo:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the [Environmental Asessment]. Third, if a finding on no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an [Environmental Impact Statement] can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. <u>Sierra Club</u> v. <u>U.S. Dep´t of Transportation</u>, 753 F.2d 120, 127 (D.C.CIR.1985).

[40] Una de las áreas en las cuales lo anterior resulta particularmente pertinente lo es cuando se impugna judicialmente la suficiencia de una declaración de impacto ambiental o de partes específicas de ella, ya que tal impugnación puede requerir considerar materia técnica que está dentro del ámbito de peritaje de la agencia. Sobre este aspecto, algunos tribunales han destacado, por ejemplo, que se debe examinar que la declaración de impacto ambiental impugnada sea adecuada y completa, no perfecta. <u>National Helium Corp.</u> v. <u>Morton (II)</u>, 486 F.2d 995 (10mo Cir.1973), <u>certiorari denegado en</u> 416 U.S. 993. Así, una declaración de impacto ambiental es deficiente si el contenido es excesivamente vago o si los datos son insuficientes, <u>U.S.</u> v. <u>27 Acres of Land</u>, 760 F.Supp. 345, 348 (S.D.N.Y.1991); si es inconsistente, <u>Oregon Environmental Council</u> v. <u>Kunzman</u>, 636 F. Supp. 632, 636 (D.Or. 1986); si es internamente contradictoria, <u>Sierra Club</u> v. <u>U.S. Army Corps of Engineers</u>, 772 F.2d 1043, 1053 (2do Cir. 1985); si está incompleta, <u>Montgomery</u> v. <u>Ellis</u>, 364 F.Supp. 517, 522 (N.D.Ala. 1973); si las evaluaciones y declaraciones de impacto ambiental violan

D.P.R. 715 (1963); véase <u>Reyes Salcedo</u> v. <u>Policía de Puerto Rico</u>, Opinión y Sentencia de 13 de mayo de 1997, 143 D.P.R. ___ (1997) (Op. Disidente Juez Hernández Denton); véase además, Demetrio Fernández Quiñones, <u>Derecho Administrativo y Ley Uniforme de Procedimientos Administrativos</u> 548 (1993).

Al examinar la resolución apelada y la declaración de impacto ambiental sometida por la Junta de Planificación, este Tribunal realiza el escrutinio judicial de todos los señalamientos de error bajo el mismo prisma, sin distinguir entre controversias que requieren ser revisadas en todos sus aspectos y controversias en las cuales se impone un trato deferente hacia la Junta de Calidad Ambiental. A nuestro juicio, cuando menos cuatro de los señalamientos de error que tenemos ante nuestra consideración requieren ser examinados en todos sus aspectos. Sin embargo, nada expresa la Opinión del Tribunal al respecto.[41]

B.

Por otro lado, uno de los aspectos que nos preocupa de la Opinión del Tribunal es que no brinda la debida atención al hecho de que el Panel Examinador de la Junta de Calidad Ambiental dio una serie de recomendaciones respecto a la Declaración de Impacto Ambiental que la Junta ignoró totalmente.

En este sentido, luego de realizar las vistas correspondientes en torno a la D.I.A.-Preliminar el Panel Examinador presentó un informe ante

---

abiertamente la intención congresional, <u>Natural Resource Defense Council, Inc.</u> v. <u>Herrington</u>, 768 F.2d 1355, 1433 (D.C.Cir.1985); o si es meramente argumentativa, <u>Student Challenging Regulatory Agency Procedures</u> v. <u>U.S.</u>, 371 F.Supp. 1291 (D.D.C. 1974); entre otras.

[41] Consideramos que son controversias de derecho revisables en todos sus aspectos las siguientes:

1. si la JCA erró al no rechazar la D.I.A.-P debido a que no fue redactada o preparada por la agencia proponente, en este caso, la Junta de Planificación de Puerto Rico.
2. si erró la JCA al no permitirle a los opositores contrainterrogar a los proponentes del proyecto sobre la D.I.A. Escrito de Apelación, a las págs. 3-4.
3. si la D.I.A. cumple con el requisito de la política energética contenida en la Orden Ejecutiva del Gobernador de Puerto Rico del 28 de diciembre de 1993.
4. si la posible venta de vapor de agua no fue debidamente atendida en la D.I.A., ya que "[l]a AES y la agencia proponente no demostraron que existiera compromiso para vender vapor de agua a alguna industria y así cumplir con los requisitos del estatuto "Public Utility Regulatory Policy Act" (PURPA)". Nótese no se trata de un cuestionamiento sobre la suficiencia de la discusión en torno al vapor de agua como posible contaminante. Se

la Junta de Calidad Ambiental con sus comentarios y recomendaciones. El informe resumió los argumentos planteados por los deponentes y estableció la posición del Panel respecto a los mismos. Luego de evaluarlos, el Panel Examinador concluyó lo siguiente:

> Considerando los planteamientos antes indicados, la información incluida en la DIA-P y los planteamientos sometidos por el público, **entendemos que las preocupaciones planteadas por los deponentes y por esta agencia son de carácter serio y merecen ser considerados, aclarados y analizados por la agencia proponente. Además, entendemos que la DIA-P resulta incompleta a la luz de las disposiciones del Reglamento sobre Declaraciones de Impacto Ambiental.**
>
> **Recomendamos por lo tanto, a la honorable Junta de Gobierno de la Junta de Calidad Ambiental que solicite a la agencia proponente considerar y aclarar las interrogantes planteadas sobre la DIA-P por medio de un "addendum" o suplemento a dicho documento.** Además, recomendamos requerir a la agencia proponente que publique un previo aviso público informando a la ciudadanía sobre la disponibilidad del suplemento, una vez el mismo sea sometido. Esta recomendación está basada en la masiva participación pública, la gran cantidad de ponencias sometidas y las interrogantes planteadas en las mismas, lo cual demuestra el gran interés de la ciudadanía sobre el particular. Entendemos que se debe proveer a la ciudadanía una oportunidad de revisar el suplemento a ser sometido, a fin de que puedan evaluar las respuestas a sus interrogantes. Petición de Certiorari, Apéndice, a la pág. 95, (énfasis suplido).

Además, el informe del Panel Examinador contiene una serie de recomendaciones sobre aspectos específicos de la D.I.A.[42]

---

trata de un cuestionamiento de si la omisión de tal consideración constituye un incumplimiento con un estatuto federal.

[42] El informe del Panel Examinador ante el cual fueron celebradas las vistas públicas consiste de un resumen de las principales preocupaciones esbozadas durante las vistas públicas, seguida por comentarios propios de los oficiales examinadores en torno a lo que ellos concibieron como deficiencias de la D.I.A. A continuación exponemos una relación de las principales deficiencias señaladas por el Panel.

1. Necesidad del Proyecto:

A juicio del Panel, la discusión contenida en la D.I.A.-Preliminar en torno a la necesidad del proyecto debió ser ampliada debido a que la misma no cumplía con las secciones 5.3.6 (k) y 5.3.7 del Reglamento Sobre Declaraciones de Impacto Ambiental. Estas secciones requieren que las Declaraciones de Impacto Ambiental contengan una discusión en torno a las necesidades de energía y alternativas o medidas de mitigación para reducir el consumo energético y que se presente, a manera de comparación, el impacto ambiental de la acción propuesta y sus alternativas.

2. Disposición de Cenizas

El Panel Examinador concluyó que la D.I.A. debía identificar los lugares que recibirían las cenizas y discutir los posibles impactos ambientales de tal disposición de acuerdo a las secciones 5.3.5 y 5.3.6 del Reglamento de Declaraciones de Impacto Ambiental.

3. Procedencia de la piedra caliza

El informe del Panel señala que se debe discutir la procedencia de la piedra caliza y de cal necesarias en el proceso de desulfurización de gases. Señala que de ser adquiridas en Puerto Rico, esto tendría un impacto en el ambiente tales como deforestación, erosión y sedimentación de cuerpos de agua.

Contrario a las recomendaciones formuladas por el Panel Examinador, la Junta de Calidad Ambiental concluyó que la D.I.A. presentada por la Junta de Planificación cumplía con los requisitos de la Ley Sobre Política Pública Ambiental. Asimismo, soslayando los señalamientos de deficiencias en la D.I.A. por parte del Panel Examinador, la resolución concluyó que "los comentarios en el Informe del Panel Examinador, se encuentran adecuadamente atendidos en la DIA-P, y que este documento, y [...] la agencia proponente [...] han cumplido cabalmente con los requisitos del Art.4-C de la Ley". Apéndice, a la pág. 18.

A juicio de este Tribunal, las recomendaciones del Panel partían de testimonios periciales, por lo que la Junta podía descartar aquellas

---

4. Fuentes de agua

En cuanto a la calidad del agua, el informe del Panel Examinador destaca que resulta necesario examinar el impacto de usar el agua del Canal de Patillas, de pozos y del superfondo de Fibers (un plumacho de agua subterránea contaminada al oeste de Guayama) sobre las operaciones agrícolas y la recarga del acuífero. Añade el Panel Examinador que: "Es importante señalar que de acuerdo con los datos incluidos en el Apéndice H, [...] de la D.I.A.-P, el balance entre recarga y descarga del acuífero no presenta ganancia o pérdida. Por tal razón, consideramos que el uso del agua de estas fuentes podría afectar adversamente el acuífero; más aún si se registrara una prolongada sequía como la que sucedió este año. Además, [la D.I.A.] deberá describir las estructuras a ser construidas en el canal para realizar la extracción propuesta".

Además, el Panel requirió la realización de un estudio científico de los niveles de aguas subterráneas en el área del proyecto y sobre cómo los mismos se podrían ver afectados por la acción propuesta.

5. Contaminación de aire y tóxicos:

Sobre este aspecto el Panel Examinador recomendó que se redujeran las emisiones de los compuestos de ácido clorhídrico (HCL), ácido fluorhídrico (HF) y el amoniaco (NH3) mediante el uso de equipo de control. Además, recomendó que se indicara en la DIA si las emisiones informadas en ella serían las emisiones sin utilizar equipo control.

Asimismo, el Panel señaló que debía demostrarse científicamente que los resultados de los modelos de simulación de dispersión realizados para determinar el impacto del proyecto en la calidad del aire son representativos del área específica. Específicamente destacaron que "deberán someter evidencia de la Agencia de Protección Ambiental Federal que los protocolos de modelaje [...] fueron aprobados por esa agencia".

Por otro lado, el Panel Examinador señaló como una de sus preocupaciones el hecho de que la discusión en la D.I.A. en torno a las emisiones de gases partió de la premisa de que el carbón de piedra tendría un por ciento de azufre máximo de 1%. El Panel Examinador recomendó que se discutiera en la D.I.A. las medidas usadas para garantizar que el carbón de azufre tendría el por ciento de azufre estimado, ya que el uso de carbón con un contenido mayor de azufre alteraría las concentraciones de bióxido que la planta emitirá a la atmósfera.

6. Suplemento de la D.I.A.

Finalmente, el Panel Examinador recomendó que se requiriera un suplemento a la D.I.A.

recomendaciones y conclusiones que consideró incorrectas y acoger aquellas que consideró correctas.

Ciertamente la Junta de Calidad Ambiental no estaba obligada por el informe del Panel Examinador. Sin embargo,

> [e]llo no quiere decir que las conclusiones del oficial examinador no merezcan nuestra consideración en revisión. Recuérdese que en estricto derecho dichas conclusiones forman parte del récord. Además, **cuando el informe del oficial examinador que preside la vista es contrario e incompatible con el del organismo administrativo, particularmente en cuestiones que dependen del contacto inmediato con la prueba, nuestra función revisora es susceptible de tornarse más rigurosa.** Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 208-09 (1987) (énfasis suplido).

Este Tribunal se niega a ser más riguroso sobre este particular. Sencillamente señala que se trata de prueba pericial sustituible por prueba pericial de la Junta de Calidad Ambiental. Estimamos que las recomendaciones de los oficiales examinadores en estas situaciones deben ser examinadas con cautela para determinar si en efecto la determinación final de la Junta de Calidad Ambiental fue correcta. En tales situaciones el rol de los tribunales en su función revisora requiere un examen cuidadoso de las recomendaciones del informe y de las razones aducidas por la entidad que finalmente toma la determinación objeto de revisión.

Por otro lado, contrario a la conclusión de la Opinión del Tribunal, no todas las recomendaciones contenidas en el informe del Panel Examinador están basadas en opiniones periciales. Muchas de las recomendaciones están apoyadas en datos provistos por los deponentes, por lo que no se trata meramente de la sustitución de la opinión pericial del panel y los deponentes por la opinión pericial de la Junta de Calidad Ambiental, como incorrectamente concluye este Tribunal.

La Opinión del Tribunal expresa, además, que la Junta de Calidad Ambiental identificó, examinó y discutió las recomendaciones del Panel Examinador de Peritos. Sin embargo, para llegar a esta conclusión, no se realiza ejercicio analítico alguno que la fundamente. En particular no se identifica, ni examina, ni discute las recomendaciones del Panel

Examinador y la discusión que al respecto, según la Opinión, contiene la resolución apelada. La revisión judicial, en este sentido, está desprovista del rigor jurídico exigido por nuestros previos pronunciamientos cuando existe incompatibilidad entre la decisión tomada por el organismo administrativo, en este caso la Junta de Calidad Ambiental, y las recomendaciones de los oficiales examinadores. Hernández v. Consejo de Educación Superior, supra.

Por otro lado, la Opinión del Tribunal destaca que la Junta de Calidad Ambiental ordenó que se incorporaran a la D.I.A. los comentarios y críticas de las personas que comparecieron a las vistas públicas. Argumenta que al así actuar "se complementó y profundizó el análisis" que se había hecho en la D.I.A. Esta aseveración resulta altamente peligrosa.

La mera inclusión de los comentarios críticos y ponencias de los deponentes como apéndice, si bien sirve para poner a la disposición del público las diversas posiciones respecto al proyecto propuesto, no significa per se que la agencia proponente los ha considerado en su proceso decisional, según lo ordena la Ley Sobre Política Pública Ambiental. Aún más, considerar que la mera inclusión de las ponencias como apéndice de las declaraciones de impacto ambiental representa "profundizar el análisis" de las consecuencias ambientales, crea la falsa impresión de con ello las agencias acatan el mandato legislativo, sin siquiera considerar y discutir seriamente en las declaraciones de impacto ambiental la validez de los argumentos presentados por la ciudadanía. Asimismo, transmite la impresión equivocada de que la Junta de Calidad Ambiental cumple cabalmente su rol fiscalizador con meramente hacer estas recomendaciones de tipo formal que nada añaden al contenido y suficiencia de la discusión que la agencia viene obligada a hacer en la declaración de impacto ambiental que elabore. Los propósitos de las declaraciones de impacto ambiental se frustran si éstas se convierten en meros compendios de argumentos a favor y en

contra de determinado curso de acción sin el análisis crítico, profundo y serio de los argumentos presentados por las partes interesadas.

El hecho de que la Opinión del Tribunal se haya desviado de lo que aquí hemos expuesto impide que podamos refrendarla. Más aún, nuestra evaluación de las controversias planteadas ante nos por los apelantes nos convence de que la Junta de Calidad Ambiental erró al determinar que la D.I.A. presentada por la Junta de Planificación cumplía con la Ley Sobre Política Pública Ambiental, en específico en cuanto a cumplir con el requisito de discutir adecuadamente la necesidad del proyecto y las alternativas existentes al mismo según lo exige la reglamentación vigente.

IV.

SURCCO nos señala que el proyecto propuesto por la Junta de Planificación es innecesario ya que, alega, los proyectos que se propone elaborar la Autoridad de Energía Eléctrica y las mejoras que se propone realizar en los ya existentes triplicarán la cantidad de megavatios necesarios.

La sección 5.3.5 del Reglamento sobre Declaraciones de Impacto Ambiental destaca que "[l]a DIA incluirá una descripción general de la acción contemplada, su propósito y necesidad [...]". Más adelante, la sección 5.3.6 expresa que:

> La DIA deberá contener una discusión del probable impacto ambiental de la acción propuesta que incluya los siguientes aspectos de ser estos relevantes a la acción:
> [...]
>
> K. Necesidades de energía y alternativas o medidas de mitigación para reducir el consumo energético.

Es evidente, pues, que los apelantes pueden cuestionar la suficiencia de la discusión respecto a la necesidad del proyecto y que como parte de ese cuestionamiento pueden impugnar con fundamentos los datos en los que se apoya esa discusión. Ahora bien, este Tribunal no puede pasar juicio sobre la sabiduría o conveniencia del proyecto propuesto. Ese es un asunto que le compete determinar a las ramas políticas y que este foro está impedido de adjudicar. Nuestro examen de

la D.I.A. sobre este aspecto, por consiguiente, se limita a evaluar si la discusión que contiene es adecuada y razonable a la luz de la política pública ambiental. Aclarado el ámbito de nuestra intervención, examinemos si el error alegado fue cometido.

La D.I.A. discute la necesidad del proyecto en la sección 2.1. Destaca que la planta de cogeneración propuesta forma parte de un plan de la Autoridad de Energía Eléctrica de satisfacer el 40% de la necesidad de capacidad de energía eléctrica proyectada. D.I.A., a la pág. 115. Señala la necesidad que tiene Puerto Rico de diversificar las fuentes de energía, de proveer un servicio energético de alta confiabilidad, y de ser autosuficiente en la producción de electricidad debido a su condición de Isla.

Asimismo, resume los hallazgos de un estudio independiente realizado por la Autoridad de Energía Eléctrica, incorporado como apéndice en la D.I.A. La sección 2.1.3 resume los hallazgos de este estudio y destaca que "[t]odos los escenarios proyectan necesidad de capacidad generatriz adicional para lograr el objetivo de confiabilidad establecido". D.I.A., a la pág. 113.[43]

Finalmente expresa la D.I.A., que el proyecto propuesto "permitirá que la AEE libere recursos económicos que podrá utilizar para ampliar y mejorar su capacidad generatriz" ya que "será un proyecto de infraestructura eléctrica financiado en su totalidad por capital privado". D.I.A., a la pág. 115.

Nuestra evaluación de la discusión respecto a la necesidad del proyecto propuesto produce varias dudas e interrogantes que la D.I.A. no contesta. ¿Cómo se enmarca el proyecto propuesto dentro de las proyecciones de la Autoridad de Energía Eléctrica para los próximos 10 años o más? ¿Cuánta energía producen las instalaciones y plantas de generación de energía existentes y como éstas comparan con lo que se espera genere la planta propuesta? ¿Se atiende sólo el interés de

---

[43] Destaca la D.I.A., además, que "[e]n la mayoría de los escenarios, se pronostica la necesidad de un mínimo de 1,000 Mv de capacidad generatriz adicional [...]. La capacidad adiconal considera el proyecto propuesto por AES-PR y otros dos (2) proyectos de energía eléctrica para lograr el objetivo de confiabilidad anualmente.". D.I.A., a la pág. 113.

confiabilidad en el servicio de energía eléctrica con este proyecto? ¿Acaso el problema de confiabilidad del sistema eléctrico del país no puede ser atendido eficientemente con una revisión de las estructuras tarifarias del servicio? ¿Puede atenderse la necesidad de confiabilidad tan sólo con los demás proyectos contemplados por la Autoridad de Energía Eléctrica? Estas interrogantes no se atienden adecuadamente en la D.I.A. La resolución apelada tampoco las contesta.

La Opinión del Tribunal, por su parte, concluye que la Junta cumplió razonablemente con su responsabilidad al atender esta interrogante toda vez que "[p]roveyó datos adicionales sobre el asunto en cuestión, tal como lo había sugerido el panel". Asimismo, expone que la política energética del país es un asunto que no nos corresponde evaluar.

Ciertamente no podemos pasar juicio sobre este último asunto. El problema es que la Opinión confunde la controversia en términos de cuánta energía adicional necesita el país con la controversia en torno a si la discusión sobre la necesidad de la planta de cogeneración de energía eléctrica propuesta para el Municipio de Guayama que contiene la D.I.A. cumple con la Ley Sobre Política Pública Ambiental y el Reglamento sobre Declaraciones de Impacto Ambiental. Estas exigen que las declaraciones de impacto ambiental contengan una discusión adecuada sobre las "[n]ecesidades de energía y altenativas o medidas de mitigación para reducir el consumo energético". Reglamento Sobre Declaraciones de Impacto Ambiental. Sec. 5.3.6. Fue la insuficiencia de esa discusión, entre otras cosas, lo que llevó al Panel Examinador de Peritos a recomendar que la Junta de Planificación de Puerto Rico suplementara la D.I.A.

Notamos que la discusión contenida en la D.I.A. sobre este asunto carece de rigor científico. No provee un análisis comparativo de la necesidad de energía eléctrica a la luz de todos los proyectos de generación de energía que contempla realizar la Autoridad de Energía Eléctrica en los próximos años. No considera si los niveles de

confiabilidad en la generación de energía pueden atenderse adecuadamente tan sólo con los otros proyectos contemplados por la Autoridad. Todo lo anterior nos convence de que la discusión sobre la necesidad del proyecto propuesto es en extremo vaga e insuficiente, tal y como lo concluyó el Panel de Examinador de Peritos de la Junta de Calidad Ambiental. Véase, Apéndice de la Apelación, a la pág. 73.

Por otro lado, no sólo es insuficiente la discusión que contiene la D.I.A. en relación a la necesidad del proyecto propuesto, sino también, la discusión en torno a las alternativas existentes a la planta de energía eléctrica propuesta.

Sobre este aspecto, Misión Industrial en su señalamiento de error C plantea que la D.I.A. no cumple con la Ley Sobre Política Pública Ambiental al no contener una discusión adecuada sobre las alternativas al proyecto propuesto.

Aquí debemos aclarar un aspecto. Cuando el Reglamento requiere que se examinen las alternativas posibles a la acción contemplada por una agencia, la determinación de si se dio cumplimiento a este requisito constituye una conclusión de derecho revisable en todos sus aspectos en revisión judicial. No se trata de meramente evaluar si la discusión de alternativas es caprichosa o arbitraria. El foro judicial debe examinar que se hayan discutido todas las alternativas que razonablemente existen, de forma que se dé cumplimiento al esquema estatutario y reglamentario. Claro está, la suficiencia de esa discusión, de ordinario, será un área del peritaje de la agencia administrativa, y por tanto, deberá ser evaluada por el foro revisor brindándole un trato deferente a la actuación administrativa.

En el presente caso, los argumentos específicos de las partes en su alegato se dirigen a cuestionar la suficiencia de la discusión que tiene la D.I.A. sobre este particular.

La sección 2.2 de la D.I.A. contiene una discusión en torno a las Fuentes Alternas de Energía y Combustible. Específicamente discute las siguientes fuentes de energía alterna: energía hidroeléctrica (sec.

2.2.1.1); energía de biomasa (Sec. 2.2.1.2); desperdicios sólidos municipales, (sec. 2.2.1.3); energía eólica (2.2.1.4); energía solar (sec. 2.2.1.5); energía de las mareas (sec. 2.2.1.6); energía térmica del océano (sec. 2.2.1.7); almacenamiento de energía (sec. 2.2.1.8); conservación de energía (sec. 2.2.1.9); combustibles fósiles (sec.2.2.2); petróleo (Sec. 2.2.2.1); Orimulsión (sec.2.2.2.2); gas natural licuado (sec.2.2.2.3); y carbón de piedra (sec.2.2.2.4). Cada discusión de estas fuentes alternas de energía contiene una breve descripción, una discusión sobre su confiabilidad, costo económico y asuntos ambientales, y un breve resumen.

Una lectura de la discusión de las alternativas contenidas en la D.I.A. revela claramente su vaguedad y superficialidad. Se trata de una discusión panorámica e enciclopédica que no contiene análisis riguroso alguno que permita que las agencias gubernamentales puedan realizar un examen juicioso de ellas. La discusión va claramente dirigida a descartar todas las posibles alternativas al carbón sin análisis comparativo de su posible costo. Sobre este aspecto, la discusión está llena de conclusiones sin siquiera datos numéricos del costo real vis a vis los costos de utilizar el carbón como materia prima para la generación de energía.

En este extremo hacemos nuestras las expresiones del Panel Examinador de Peritos de la Junta de Calidad Ambiental cuando destaca lo siguiente:

> La DIA-P es somera en la discusión de las alternativas. El uso de fuentes de energía renovable y de combustible como gas natural licuado, orimulsión, etc., es descartado sin que se realice una comparación completa y objetiva que considere los aspectos económicos de la construcción, operación y especialmente de las externalidades [sic]. No se establece una comparación de los costos externos de la utilización de diferentes combustibles y de métodos de generación de energía y mantenimiento. Apéndice de la Apelación, a la pág. 73.

Más adelante destaca el mismo informe:

> No se discuten las alternativas de aumentar al máximo posible la eficiencia de las facilidades de generación existentes, la implantación de programas que incentiven la reducción del consumo de energía, como los son: la reducción de la demanda pico mediante un programa de manejo de consumo

de energía ("Demand-Side Management" – DSM) completo y agresivo, programas de conservación de energía semejantes a "Greenlight", "Time of day use" y otros. Id.

Compartimos las preocupaciones del Panel Examinador de Peritos. Contrario a la recomendación transcrita, la Junta de Calidad Ambiental sólo describe el contenido de la D.I.A. sobre este aspecto, sin examinarlo ni analizarlo. De este modo, la fiscalización que la Junta realiza en torno a la discusión de las alternativas al proyecto propuesto se limita a evaluar si la D.I.A. contiene alguna discusión de alternativas energéticas como mera cuestión de formalidad. Así, su examen está descarnado del rigor científico que nuestro esquema estatutario y reglamentario le impone aplicar a esa entidad administrativa. Por ello, no podemos refrendar la resolución apelada.

Al igual que el Panel Examinador de Peritos de la Junta de Calidad Ambiental, consideramos que la D.I.A. contiene una discusión incompleta y vaga. La misma genera muchas dudas en cuanto a si la agencia proponente realmente ha considerado todas las consecuencias ambientales de la acción propuesta, particularmente en el contexto de un proyecto que considera como materia prima un material tan contaminante como el carbón. En vista de ello, revocaríamos la resolución de la Junta de Calidad Ambiental en la que se determinó que la D.I.A. presentada por la Junta de Planificación cumple con la Ley Sobre Política Pública Ambiental y ordenaríamos que la agencia proponente de la planta de cogeneración de energía en Guayama elabore un suplemento que atienda adecuadamente los planteamientos específicos que hemos formulado.


Federico Hernández Denton
Juez Asociado